**Louis H. MANKO, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 79–1011–CV–W–9.**

United States District Court, W.D. Missouri, W.D.

June 5, 1986.

---

Charles M. Thomas, Jeffrey D. Zimmerman, Grier, Swartzman & Weiner, Kansas City, Mo., for plaintiff.

W. Russell Welsh, U.S. Dept. of Justice, Civ. Div., Washington, D.C., Judith Strong, Asst. U.S. Atty., Mary McElroy Leach, Trial Atty., Torts Branch Civ. Div.—U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM ORDER AND JUDGMENT

BARTLETT, District Judge.

Anticipating an outbreak of swine flu in 1976, the federal government undertook a massive immunization effort through the National Swine Flu Immunization Program Act of 1976, Pub.L. No. 94–380, § 2, 90 Stat. 1113 (August 12, 1976) (codified at 42 U.S.C. § 247b(j)) (repealed by Pub.L. No. 95–626, § 202, 92 Stat. 3574 (1978), 42 U.S.C. § 247b (1978)) (hereafter called the Swine Flu Act). The program was directed at the prevention of an anticipated epidemic of swine flu in the United States adult

population through the vaccination of large numbers of people in nationwide immunization centers. To encourage pharmaceutical companies to supply the vaccine, Congress relieved the companies of liability for injuries resulting from its use and provided remedies against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

On October 1, 1976, the swine flu immunization program began. On December 18, 1976, the Center for Disease Control declared a moratorium on swine flue vaccinations to investigate an increased incidence of Guillain-Barre Syndrome (GBS) in the adult population and an apparent association between GBS and the swine flu vaccination.

Plaintiff Louis Manko received a swine flu vaccination on October 20, 1976. On January 15, 1977, plaintiff was admitted to Menorah Medical Center with paralysis in his legs and arms that was diagnosed as GBS.

On November 14, 1979, plaintiff Louis Manko initiated this lawsuit by filing his complaint against defendant the United States seeking damages under the Federal Tort Claims Act and the Swine Flu Act. On January 31, 1980, this case was transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia, *In re: Swine Flu Immunization Products Liability Litigation*, MDL 330, Misc. No. 78–0040, Civil Action No. D.C. 80–0255, for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. On June 9, 1980, the Judicial Panel on Multidistrict Litigation remanded this case to the United States District Court for the Western District of Missouri for further pretrial proceedings and trial.

The Final Pretrial Order, paragraph IX, p. 9 issued by the United States District Court for the District of Columbia in the Multidistrict Litigation (D.D.C. November 15, 1979) stated in relevant part that:

The United States and the plaintiffs disagree as to whether the injuries alleged can be caused by administration of the vaccine, except that the United States has stipulated that the Guillain-Barre Syndrome can be caused by the vaccine in certain instances.

If the United States has stipulated that the plaintiff in fact developed the Guillain-Barre Syndrome at any time, it will remain to be determined whether such injuries were in fact caused by administration of the vaccine, but it will not be necessary for plaintiff to establish any theory of liability, i.e. negligence or any available theory founded on the law of the applicable jurisdiction. Thus, the only liability issue in such cases will be causation, unless the United States has also stipulated as to causation....

In defendant's response to plaintiff's request for admission filed January 20, 1981, defendant admitted that subsequent to receipt of the swine flu vaccine, plaintiff contracted GBS and that plaintiff need not prove negligence or any other legal theory in order to establish liability against the United States. Therefore, pursuant to the Final Pretrial Order and defendant's January 20, 1981, admission, the sole liability issue is whether plaintiff's swine flue vaccination caused his GBS.

## I.

### MOTIONS

*Motion to Strike Mayo Clinic Records*

On December 5, 1983, pursuant to defendant's motion and plaintiff's consent, this Court ordered plaintiff to submit to a medical examination at the Mayo Clinic to evaluate plaintiff's alleged impotence. Plaintiff was examined and tested over a five day period in December, 1983.

On November 27, 1984, during the hearing on damages, the Mayo Clinic records (Plaintiff's Exhibit 409) were admitted in evidence *without objection by defendant.* Tr. 25–96. Dr. Lichtenfield, plaintiff's neurological expert, testified on direct examination about the Mayo Clinic records and specifically about the diagnoses of the Mayo Clinic physicians. Tr. 25–39. On cross-examination, defendant examined Dr. Lichtenfield about the tests conducted at

Mayo Clinic (Tr. 25–107) and the diagnosis from Mayo Clinic. Tr. 25–121. Then the Court examined Dr. Lichtenfield about the Mayo Clinic records. Tr. 25–137 to 25–140. The Mayo Clinic records were mentioned by other witnesses, including Dr. Rhamy, Dr. Leifer and Dr. Victor.

At oral argument on the issue of damages on December 14, 1984, the United States made an oral motion to limit the admissibility of the Mayo Clinic records based on *Skogen v. Dow Chemical Co.*, 375 F.2d 692 (8th Cir.1967). Tr. 31–10. At that time the Court reserved ruling on defendant's motion to give plaintiff an opportunity to read the case cited by defendant and brief the issue. On December 20, 1984, plaintiff filed a brief on this issue.

■ In *Skogen*, the Eighth Circuit held that a doctor's opinion of how his patient's accident occurred is inadmissible hearsay under the business records statute, 28 U.S.C. § 1732(a). Thereafter, Congress enacted Rule 803(6), Federal Rules of Evidence, and repealed § 1732(a). The diagnoses contained in the Mayo Clinic records are admissible under the more liberal standards contained in Rule 803(6). The Advisory Committee notes to Rule 803(6) expressly state that *Skogen* and its interpretation of § 1732 are no longer good law. Rule 803, Federal Rules of Evidence, *Notes of the Advisory Committee on Proposed Rules, note to Exception 6.*

■ Further, the defendant waived its objection by its failure to timely object. Defendant's objection at oral argument after the evidentiary record had been closed only served to needlessly complicate the issues before the Court.

Therefore, defendant's oral motion to strike the Mayo Clinic records (Plaintiff's Exhibit 409), is denied.

### Defendant's Motion to Keep Open the Record

Presentation of evidence on the issue of causation concluded on February 17, 1984. During oral argument on February 21, 1984, the United States made an oral motion to keep the record open so that Dr. Nathanson could submit a revision of De-fendant's Exhibit 273 (Dr. Nathanson's analysis of whether there was a drop in reporting the occurrence of GBS in the immunized population after December 18, 1976). Plaintiff objected to the admission of additional evidence after the record closed and the Court suggested defendant file a written motion. On February 22, 1984, defendant filed a written motion to keep the record open. On April 16, 1984, defendant filed a renewed motion to keep the record open and attached a copy of Dr. Nathanson's revision of Defendant's Exhibit 273.

During presentation of defendant's case, Dr. Nathanson testified extensively on behalf of defendant. Later, Dr. Nathanson was recalled at the Court's request and testified concurrently with Dr. Goldfield in rebuttal. Dr. Nathanson has been given an adequate opportunity to present his expert opinion and its basis.

■ If the tendered revision of defendant's Exhibit 273 was admitted into evidence, it is fair to assume that plaintiff would request an evidentiary hearing to cross-examine Dr. Nathanson. Further delay in concluding this case is not justified. Defendant's request to introduce a revised defendant's Exhibit 273 is denied.

### Motion to Strike Dr. Goldfield's Testimony

During the trial, the United States objected to Dr. Goldfield's expert testimony on the cohort analysis. Tr. 7–53. After the trial, both parties briefed the issues raised by this objection.

Defendant first argues that Dr. Goldfield's testimony about his cohort analysis should be stricken because it does not satisfy the standard for scientific techniques set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). In *Frye*, the Court held that testimony based on the results of a polygraph test was inadmissible because scientific recognition of the accuracy of the technique was inadequate.

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is

difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while the courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Id.* at 1014.

■ Apparently, the United States believes that because its experts did not use the Mantel/Haenszel cohort analysis to make their epidemiological evaluations, then the cohort analysis is not generally accepted in the epidemiological community. Although plaintiff's experts and defendant's experts dispute whether the underlying data is stratified, i.e., whether there was a drop in reporting after December 18, 1976, all the experts agreed that the Mantel/Haeznel approach is a recognized and generally accepted method of analyzing stratified epidemiological data. Based on the Court's conclusion that the data was stratified, the Mantel/Haenszel analysis is the appropriate and generally recognized method of determining whether there was a statistically meaningful association between a swine flu vaccination and contracting GBS.

■ The United States next argues that Dr. Goldfield's testimony should be stricken under Rule 702, Federal Rules of Evidence, because it did not assist the trier of fact. Dr. Goldfield's expertise and testimony unquestionably assisted this Court in evaluating the available epidemiological data and in deciding the causation issue.

The United States next argues that Dr. Goldfield's expert testimony should be stricken under Rule 703, Federal Rules of Evidence, because Dr. Goldfield relied on data obtained from administrative claim forms that are not of the type reasonably relied upon by experts.

Rule 703 provides that:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

■ Defendant's argument is without merit for two reasons. First, the administrative claim forms were admitted into evidence. Second, Dr. Goldfield testified and the Court finds that the data contained in the administrative claim forms is the type reasonably relied upon by epidemiologists in forming opinions.

For the reasons stated, defendant's motion to strike Dr. Goldfield's expert testimony is denied.

## II.

## CAUSATION

### A. *Guillain-Barre Syndrome*

GBS is not a well-defined organic disorder but rather a collection of neurological symptoms and findings. It is a peripheral neuropathy characterized by an immune-mediated attack on the peripheral nervous system [1] resulting in inflammation and demyelination of the nerves, particularly the peripheral nerves. A demyelinating illness causes destruction and loss of the myelin sheath, or the insulation surrounding the nerve fibers. Demyelinated nerve fiber will not conduct impulses from the central nervous system in a normal fashion.

A typical case of GBS involves rapid onset of neurological dysfunction progressing rapidly to paralysis of the legs and/or arms. This phase of the disease, called the acute phase, typically begins with neurological symptoms such as tingling, numbness, or weakness in the toes, feet, fingers and/or hands and progresses along the limbs to the trunk. The severity of the weakness ranges from mild ataxia (failure

---

**1.** The central nervous system consists of the brain and the spinal cord. The peripheral nerv-

ous system consists of the nerve roots extending from the spinal cord to the extremities.

of muscle coordination) to paralysis with maximum weakness within two months in ninety percent of the cases. The acute phase is then followed by a much longer recovery period during which most patients gradually regain use of their limbs. Although most patients make a complete recovery, approximately five percent of GBS victims suffer some residual neurological deficit.

The etiology, or cause, of GBS is unknown. However, it has been associated with numerous antecedent events such as a viral infection. In 1976, an epidemiological report, the Schonberger study, was released indicating that the swine flu vaccine was an antecedent event, leading to the onset of GBS up to ten weeks after the innoculation. Schonberger, et al., *Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program*, American Journal of Epidemiology, Vol. 110, No. 2, 105 (1979) (Defendant's Exhibit 38).

### B. *Applicable Law on Issue of Causation*

The law of the place where the tort occurred is applicable to claims against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2675. *Hungate v. United States*, 626 F.2d 60, 61 (8th Cir.1980). Here, it is undisputed that plaintiff received his swine flu vaccination in Kansas City, Missouri. Therefore, Missouri law applies to the issues raised by plaintiff's claim.

Under Missouri law, the burden of proof is on plaintiff to show by a preponderance of the evidence that plaintiff's GBS was a reasonable and probable consequence of plaintiff's swine flu vaccination. *George v. Howard Const. Co.*, 604 S.W.2d 685, 692 (Mo.App.1980).

### C. *Plaintiff's Causation Theories*

Plaintiff argues that the evidence presented at trial establishes that plaintiff's GBS was a reasonable and probable consequence of plaintiff's swine flu vaccination because:

a) plaintiff demonstrated GBS symptons in the fall of 1976 shortly after plaintiff received the swine flu vaccination and these symptoms smoldered until early January 1977, when plaintiff became acutely ill; or

b) even if the symptoms of plaintiff's GBS were first manifested in early January 1977, there is a causal relationship between plaintiff's GBS and the swine flu vaccination based on a proper epidemiological analysis of available data; or

c) based on cases that were deemed long onset cases of GBS pursuant to discovery sanctions imposed in the Court's November 29, 1983, Order, there is a causal relationship between plaintiff's GBS and his swine flu vaccination regardless of whether plaintiff's analytical approach or defendant's analytical approach is used.

### D. *There is a Causal Relationship Between Plaintiff's GBS and the Swine Flu Vaccination Because the Onset of Plaintiff's GBS Was Within Three Weeks of the Vaccination.[2]*

Plaintiff argues that he suffered from chronic or smoldering GBS that began with neurological impairments such as tingling in the hands and feet, fatigue, light-headedness and weakness in his legs in early

---

**2.** After the presentation of evidence on liability in January 1984, the Court advised the parties orally that plaintiff had established that the swine flu vaccine caused plaintiff's GBS and instructed them to begin preparation of the damage issues.

The Court advised the parties that this conclusion on causation was based on the following tentative findings:

a) although there is a smoldering or chronic form of GBS, the Court was not persuaded by plaintiff's witnesses that in fact he suffered from this form of GBS in November-December 1976; and

b) even if plaintiff's GBS first manifested itself 13 weeks after the vaccination, there was a causal connection between the vaccination and the GBS.

After careful study of the extensive record and further consideration of my impressions of plaintiff and plaintiff's witnesses, I have changed my tentative conclusion on a) for the reasons set forth in the opinion. If either party believes that this change has prejudiced their presentation on damages, an appropriate motion under Rule 59 should be filed within ten days from the date of this Order.

November, 1976. His condition progressively worsened during November, 1976, and December, 1976, and erupted into acute GBS on January 15, 1977.

Defendant argues that a) GBS does not exist in the chronic or smoldering form; and b) the testimony of plaintiff, his family, friends and co-workers about plaintiff's symptoms in November-December, 1976, was not credible.

1. Smoldering Guillain-Barre Syndrome

Two neurologists testified on behalf of plaintiff. Dr. Peter Lichtenfield is a neurologist in private practice in Long Island, New York, with teaching appointments at the Cornell University Medical College and the State University of New York. Dr. Lichtenfield is the former head of the Division of Neurology at the Roger Williams General Hospital. Dr. Milton Alter is the Chairman of the Department of Neurology at Temple University Hospital. Dr. Lichtenfield and Dr. Alter both had extensive experience in the diagnosis and treatment of GBS.

■ Based on the credible testimony of Dr. Lichtenfield and Dr. Alter, the Court is convinced that the symptoms of GBS can be manifested either suddenly (acute GBS) or or over a period of time (smoldering or chronic GBS). According to Dr. Alter, GBS is technically defined as being both chronic inflammatory polyneuritis and acute inflammatory polyneuritis. Both neuropathies involve the same immune mediated process. The distinction is the length of time it takes symptoms to develop. The chronic or smoldering form of GBS is characterized by a slow progressive period of onset with gradually worsening neurological impairments such as tingling in the hands and feet, fatigue, light-headedness and weakness in his legs.

Defendant's neurologists, Dr. Barry Arnason, Chairman of the Department of Neurology at the University of Chicago and a noted expert in the field of neuroimmunology, and Dr. Maurice Victor, Professor of Neurology at Case Western Reserve University School of Medicine and Chairman of the Department of Neurology at Cleveland Metropolitan General Hospital, testified that GBS exists in a single form characterized by rapid onset of weakness, with the acute phase reaching its zenith in approximately one to four weeks, followed by stabilization of the neurologic process and then a lengthy recovery.

Although Dr. Arnason and Dr. Victor have excellent credentials, the Court was not persuaded by their insistence that GBS occurs only in the acute form. The first edition of a textbook titled "Peripheral Neuropathy" authored by Peter Dyck, Peter Thomas and Ed Lambert, which Dr. Arnason testified was the standard textbook for peripheral neuropathy, states that the acute form and chronic form of GBS are variants of the same disease and that "the majority of slowly progressing sporadic cases of chronic neuropathy represents variants of acute inflammatory polyradiculoneuropathy.:..." Tr. 13–134; Plaintiff's Exhibit 2. Recently, Dr. Arnason co-authored Chapter 91 of the second edition to reflect the author's view that the chronic and acute neuropathies are separate and distinct entities. The coincidence of the involvement of Dr. Arnason in the nationwide GBS litigation, the changing of his opinion about the existence of chronic GBS and the rewriting of the textbook to reflect his new opinion, casts a shadow over the change in opinion. In short, the Court was not persuaded that absent the GBS litigation, this change in opinion would have occurred.

In a 1981 textbook authored by Dr. Victor, he states "[c]ases with steady or stepwise progression over weeks or months, some of which show asymmetries of involvement, with recovery in some parts and worsening in others, are other variants. A relapsing form is also known and was noted in approximately 10 percent of the cases." Tr. 14–30. Dr. Victor now believes that "I no longer would phrase that statement in the same way based on a sharpening of my knowledge and further experience with these diseases. Instead of calling it a variant, I would now refer to it as a distinctive clinical entity, separable on a variety of clinical grounds from acute Guillain-Barre Syndrome. I wouldn't refer

to it as a variant." Tr. 14–30 to 14–31. Dr. Victor plans to change this chapter in the next edition to reflect his view that chronic and acute inflammatory neuropathies are distinct entities. On cross-examination, Dr. Victor conceded that the most important factor in bringing about this distinction is the swine flu litigation and that all of the neurologists advocating a single form of GBS have been involved in the swine flu litigation. Tr. 14–33.

### 2. Plaintiff Suffered From Smoldering Guillain-Barre Syndrome

In October 1976, plaintiff was a vibrant, outgoing, physically active man. He had a firm handshake and a brisk steady walk. He was and had been employed for 37 years by R & M Kaufman, a clothing wholesaler. His position as regional sales manager involved supervising sales people. He attended the major markets in his region to supervise and assist his sales staff. At these markets, plaintiff was on his feet eight to twelve hours a day and then socialized in the evenings. Plaintiff's co-workers described him as a man with incredible vitality who never got tired, "a horse" and "strong as an ox." Plaintiff was not one to complain about his physical condition.

When he was not traveling on business, he and his wife, Sylvia, enjoyed entertaining in their home or attending parties given by others. Plaintiff enjoyed dancing, playing golf, attending sporting events and the theatre. At least once a year, usually in December, plaintiff and his wife vacationed in a warm climate.

On October 20, 1976, plaintiff received a swine flue vaccination in Kansas City, Missouri.

On October 23, 1976, plaintiff went to a market in Dallas, Texas, for five days. He was on his feet continuously from approximately 8:00 a.m. to 10:00 p.m. On October 30, 1976, plaintiff went to a market in St. Louis, Missouri. At the St. Louis market, plaintiff felt unusually fatigued, lethargic and was unable to stay on his feet all day. He suffered muscle soreness in his left leg, intermittent headaches and light-headedness.

On November 7, 1976, plaintiff went to the Chicago, Illinois, market. Plaintiff had constant headaches, felt light-headed and suffered from muscle spasms and soreness in his legs. Plaintiff had difficulty standing for prolonged periods of time. A business associate, Ed Tannebaum, observed plaintiff sitting more than usual and walking like an old man. When Tannebaum asked plaintiff to go out for dinner, plaintiff told him that he was having problems with his legs and that he was tired. Plaintiff complained of charley horses and muscle spasms in his legs. Tannebaum stated that this was very uncharacteristic of plaintiff who he described as "an absolute bull."

On November 14, 1976, plaintiff went to the Minneapolis, Minnesota, market. There, plaintiff's physical problems worsened. He sat constantly. He suffered from dizziness, light-headedness, increased instability on his feet and loss of equilibrium.

From mid-November to mid-December, plaintiff worked in his office in Kansas City. Because of fatigue and light-headedness, plaintiff could not work his normal long hours. He was not able to call on the accounts he usually called on at this time of year. The soreness in plaintiff's left leg increased. He began having soreness, tingling and numbness in his right leg and left hand. Plaintiff suffered from lethargy, headaches and light-headedness; he was unusually irritable.

Plaintiff's son, David Goodman, noticed that plaintiff's grip was weak when they shook hands. During this period of time Florence Gottlieb, a long-time friend of plaintiff's wife, went to plaintiff's home to play bridge with his wife. While there, she observed that plaintiff did not walk with his usual springy gait. Plaintiff walked slowly and seemed to shuffle along rather than pick up his feet. She testified that plaintiff appeared tired and sluggish. Maxine Mooney, a friend of the Mankos for over forty years, testified that they socialized frequently. During the latter part of November, she noted that plaintiff seemed

irritable and lacked energy. She though plaintiff had had a slight stroke.

On December 21, 1976, plaintiff went to a regional sales meeting in Chicago at which he was offered the position of national sales manager for R & M Kaufman. Ed Tannebaum testified that plaintiff appeared very sluggish and was walking like an old man. Donald Smith, a regional sales manager with R & M Kaufman who has known plaintiff since 1959, noticed that plaintiff walked slowly and had trouble keeping up with people. He testified that plaintiff complained that his legs did not feel good and that he was having cramps in his legs.

During late December and early January, plaintiff's condition worsened. He had increased difficulty walking. Several friends noted that plaintiff acted strangely at parties. For instance, Rita Gershon, a close personal friend of the Mankos, testified that she observed plaintiff at a New Year's Eve party at the Oakwood Country Club. She testified that plaintiff, who normally danced at such parties, would not dance because he said that his legs were bothering him. At a party on the following day, plaintiff sat apart from his friends. He got out of the chair "like an old man" pushing himself out of the chair with his arms. He was unsteady on his feet. Maxine Mooney also saw plaintiff at the New Year's Eve party at the Oakwood Country Club. Plaintiff was unusually quiet and did not dance.

Helen Rae Cerier, plaintiff's sister-in-law, saw plaintiff around December 23, 1976. She observed plaintiff use his arms to push himself out of a chair and walk very slowly with an old man's shuffle.

Between approximately January 4, and January 9, 1977, plaintiff had a flu-like illness.

On January 11, 1977, plaintiff flew to Chicago, Illinois, to commence work as national sales manager. His wife accompanied him because she was concerned about his health.

On January 12, 1977, plaintiff drove to R & M Kaufman's office in Aurora, Illinois. He did not feel well but worked all day in his new job as national sales manager. Plaintiff drove back to the hotel in Chicago, Illinois. Plaintiff's difficulty in walking had increased; he had to stop and rest during the three block walk between his hotel and the parking garage. When he got to the hotel, he had to pull himself up the stairs of the hotel by grabbing the handrail. When he reached his apartment, he began to cry because he was so weak and ill.

On Thursday, January 13, 1977, plaintiff got up and drove to work. During the day he suffered leg cramps in his legs. After working all day, plaintiff drove back to the apartment in Chicago. In the evening, plaintiff fell several times while walking three blocks from the parking garage to the hotel. The Mankos decided to return to Kansas City on Saturday so plaintiff could see his regular physician.

On January 14, 1977, plaintiff went to work. At 10:00 a.m. he got up from his desk to go to a meeting and could not walk. He could move only by shuffling his feet. Plaintiff became very frightened at his increasing weakness and immediately made arrangements to return to Kansas City to see his regular physician. Plaintiff drove back to his apartment and parked his car directly in front of the hotel. Again, plaintiff had to pull himself up the stairs into the hotel lobby. Plaintiff could not lift his suitcase. Plaintiff drove to the airport and as he got out of the rental car, he fell because his legs buckled. He fell again getting into the bus. He required assistance getting up the bus steps. The bus driver had to assist plaintiff off the bus when it arrived at the airport. Plaintiff's wife helped him into the airplane. While waiting for his luggage in the Kansas City airport, plaintiff collapsed again. Two strangers picked him up, drove the Mankos home in their limousine and carried plaintiff into his house. As plaintiff attempted to get out of the limousine, he fell and cut his leg.

Early the following morning, plaintiff got out of bed, completely collapsed and was unable to push himself up with his arms or legs. He became hysterical and had to crawl into the bathroom. Plaintiff's

wife called plaintiff's doctor and was told to transport plaintiff by ambulance to Menorah Medical Center. When plaintiff was admitted to the hospital, he could not move his arms or legs.

Dr. Gustave Eisemann, the member of the Statland Clinic on call on January 15, 1977, was plaintiff's admitting physician in the emergency room at Menorah Medical Center. Dr. Eisemann spent approximately ten minutes taking the following medical history from plaintiff and his wife:

> The patient was apparently in good health until Thursday except for a mild upper respiratory illness. Thursday evening he noticed some weakness and fatigue and felt that this was possibly associated with a prolonged drive from Aurora, Illinois to Chicago where he has an apartment and also as a result of tension and anxieties of the last few weeks. Yesterday morning the patient had more weakness, feeling of numbness and tingling sensation in his lower extremities. He was able to complete his work in Chicago yesterday, however, when he arrived at the airport in Kansas City he was unable to lift his baggage because of marked weakness. He was unable to walk without assistance because of the persistent weakness. He continued to have progressive muscular weakness during the evening when trying to get out of bed at night to urinate and had to crawl to the bathroom. This morning he was unable to sit up or to walk and because of this he was brought to the hospital by ambulance. No history of chills or fever. No history of other underlying illness recently. The patient had a Swine flu shot in this office on 10–20–76 without complication. He was scheduled to have a regular check-up in the office in a couple of days. He has had no unusual illnesses in the recent past.

Defendant's Exhibit 59, p. 5.

Dr. Mario Kafeng Sia Yu, a neurologist, was called in by Dr. Eisemann to verify the diagnosis of GBS. On January 15, 1977, Dr. Yu did a complete neurological examination. The history recorded by Dr. Yu states:

> The patient had a bad flu on January 4, 1977, with fever, chills and diarrhea. This lasted about one week. Four days ago he went back to work and had to travel a lot. Two days ago he developed cramping of the right lower extremity that he has had in the past. Yesterday morning, his lower extremities became progressively weaker to the point of having to drag his legs when walking. By yesterday afternoon his upper extremities became weak and he could not carry the luggage. Last night he fell to the ground because his legs buckled on him. Last night he had crawled to the bathroom. He felt his weakness is worse today compared to last night. He denies difficulty in breathing or swallowing. There is no paresthesia. There is no bladder or bowel dysfunction. He had no recent vaccination although he had a swine flu shot in October of 1976.

Defendant's Exhibit 59, p. 7.

Dr. Elliott Frank, the resident physician on duty at Menorah Hospital on January 15, 1977, recorded the following history:

> [Year old white male] last 2 days has noted increasing weakness of arms and legs. So bad today he had to crawl to bathroom. Has had minor pain [left] leg 2–3 days ago, but not now. [Patient] had swine flu shot 6 weeks ago. Had GI [gastrointestinal] flu w/nausea, vomiting, diarrhea, temperature two weeks ago. Has been commuting from here to Chicago in a new job. Physical examination: alert, oriented, NAD [not acute distress]

Defendant's Exhibit 59, p. 17.

Defendant argues that the testimony of plaintiff, his family, friends and business associates about their observations of plaintiff in November, December and early January is not credible and should be rejected because plaintiff did not tell the doctors on January 15, 1977, about the problems he had been having since early November.

When these medical histories were taken and recorded, the doctors' primary concern was to make an immediate diagnosis and to initiate the appropriate treatment. The

doctors were not interested in investigating past events beyond what was necessary to make the proper diagnosis.

Dr. Eisemann testified that he focused primarily on the twenty-four to forty-eight hours immediately preceding admission because this period was most important in making the diagnosis. When he ascertained that the severe symptoms had developed rapidly, it was not necessary to inquire carefully about plaintiff's physical condition in November-December, 1976.

Although the doctors probably did ask plaintiff how long he had been experiencing problems with his legs, his failure to respond to such a question with a recitation of the problems he had been having since November 1976, is understandable. At the time plaintiff was admitted to the emergency room, he was almost completely paralyzed. Undoubtedly, when asked when his symptoms began, plaintiff focused on the rapidly progressing and severe symptoms he had experienced in the past two days. Plaintiff's inclination to focus on the immediate past was encouraged by the doctors' interest in the immediate past. Recollection of the problems plaintiff had been having since November 1976, and realization of their possible significance would come only after the crisis had passed.[3]

Defendant also argues that the testimony of plaintiff's witnesses should be rejected as incredible because plaintiff failed to consult his physician about these symptoms from November to early January. Defendant asserts that an analysis of plaintiff's past medical history shows plaintiff did not hesitate to bring minor physical ailments to the attention of his physician. Defendant prepared a chart purporting to demonstrate that plaintiff consulted his physician ninety-two times in twenty years, or approximately four times per year. Plaintiff's Exhibit 92.

Plaintiff's medical history does not suggest that he was a chronic complainer or that he regularly called his doctor for minor complaints. To the extent the medical records show minor complaints, most of them were made when plaintiff was in the doctor's office for some other purpose. During this twenty year period, plaintiff had conditions that required him to see his physician frequently and regularly. For instance, there was a period of time during which plaintiff saw his physician regularly to check high blood pressure. Also, plaintiff had regular physicals.

Further, plaintiff, his wife and others who knew him well testified that he did not go to the doctor easily. For instance, his wife frequently had to call the doctor for plaintiff because he would not.

Plaintiff's conduct around the time he was admitted to the hospital is consistent with this testimony. As plaintiff's symptoms worsened in Chicago, he did not call a doctor either in Chicago or Kansas City even though his Kansas City doctor was a personal friend. Plaintiff continued to work until his condition became so debilitating that he had to return to Kansas City. Even after returning to Kansas City, neither plaintiff nor his wife called his doctor until he completely collapsed early in the morning on January 15, 1977.

■ Therefore, based on the credible testimony of plaintiff, plaintiff's family, friends and co-workers, plaintiff began hav-

---

**3.** A comparison of the medical histories taken by the admitting physicians suggests that they are not complete and accurate records of past events. For instance, the medical histories contain contradictory information about what, if any, antecedent illness plaintiff suffered in early January. Dr. Eisemann recorded plaintiff's prior illness as a mild upper respiratory illness; Dr. Yu recorded that plaintiff had a bad flu with fever, chills and diarrhea lasting about a week; and Dr. Frank recorded that plaintiff had gastrointestinal flu with nausea, vomiting, diarrhea and a temperature. There is also an inconsistency about the date plaintiff received his swine flu vaccination. Dr. Eisemann stated that plaintiff received the vaccination on October 20, 1976; Dr. Yu stated that plaintiff received the vaccination in October of 1976; and Dr. Frank stated that plaintiff received the vaccination six weeks ago. There is an inconsistency on the issue of whether plaintiff suffered from parasthesia (a pins and needles sensation) in plaintiff's lower extremities. Dr. Eisemann stated that plaintiff suffered from numbness and tingling in his lower extremities. Dr. Yu recorded that plaintiff suffered no paresthesia and Dr. Frank does not mention this symptom.

ing neurological symptoms in early November. Neurological symptoms continued until early January 1977 when they suddenly accelerated in severity. These gradually worsening neurological impairments were symptoms of smoldering GBS. The acute phase was triggered by the flu plaintiff suffered in early January 1977.

Defendant's neurologists offered no credible explanation other than GBS for the neurological symptoms plaintiff suffered in November 1976 through December 1976. For instance, Dr. Victor testified that plaintiff's symptoms were signs of depression not GBS. On the other hand, Dr. Arnason had no explanation for plaintiff's symptoms but concluded that the symptoms were not symptoms of depression.

Defendant concedes that if the onset of plaintiff's GBS was approximately three weeks after the swine flu vaccination, there was a causal relationship between the vaccination and the GBS. Therefore, plaintiff has established that his GBS was caused by the swine flu vaccination he received in October, 1976.

### E. Even if the Onset of Plaintiff's GBS Was in Early January, 1977, the Swine Flu Vaccination Caused Plaintiff's GBS.

Plaintiff's second causation theory is based on an epidemiological analysis to determine the effect of swine flu vaccinations on the rate of incidence of GBS. Plaintiff argues that a proper analysis of the epidemiological data demonstrates that the swine flu vaccinations caused a statistically significant enhanced risk of contracting GBS for a period extending beyond thirteen weeks after vaccination.[4] (Plaintiff received a swine flu vaccination on October 20, 1976, and entered the hospital on January 15, 1977, some 13 weeks later.)

Defendant argues that a swine flu vaccination only increased the relative risk of contracting GBS to a statistically significant level for six weeks after the vaccination.[5]

Epidemiology is the study of the available data to determine whether a causal relationship exists between an event and

4. Plaintiff's experts on the epidemiology issue were Dr. Martin Goldfield and Dr. Nathan Mantel. Dr. Martin Goldfield, graduated from Boston University School of Medicine in 1950 and specialized in infectious diseases from 1950–1953. From 1953 until 1958 he taught Infectious Diseases and Epidemiology at the Department of Medicine and the Department of Preventive Medicine and Public Health at Tulane University. From 1958 to 1977, he was Assistant Commissioner, Division of Laboratories and Epidemiology of the New Jersey State Health Department. During 1977–78, he was Director of Research at the Division of Laboratories, Epidemiology and Research of the New Jersey State Department of Health. While in New Jersey he was an Associate Clinical Professor of Infectious Diseases at Seton Hall College of Medicine, Professor of Epidemiology in the Department of Preventive Medicine at the New Jersey College of Medicine, and Visiting Professor in Epidemiology at the University of Pennsylvania School of Veterinary Medicine. From 1978–1983, he was Professor of Epidemiology in the Department of Preventive Medicine in Public Health and Professor in Microbiology and Preventive Medicine in the School of Medicine at the University of South Carolina. Although Dr. Goldfield is partially retired, he retains an adjunct professorship in Microbiology and Epidemiology at the University of South Carolina School of Medicine.

Dr. Nathan Mantel received his Bachelor of Science degree from City College of New York and a master's degree in statistics from the American University in 1956. He began doing statistical work in economics for the War Production Board and the General Land Office at the Department of Interior. Dr. Mantel then went to work for the National Institute of Health which later became the National Cancer Institute. Dr. Mantel was senior mathematical statistician at the National Cancer Institute until about 1974. Dr. Mantel is currently a research professor of statistics at the Department of Mathematics and Statistics and Computer Scientists at American University in Washington, D.C. Dr. Mantel is known for his contributions to the Mantel/Haenszel procedure which has been widely accepted as the cornerstone analysis for epidemiological studies when an independent factor, such as age, causes a difference between two otherwise comparable populations necessitating the application of a standard adjustment technique.

5. Defendant's experts on the epidemiology issue were Dr. Neal Nathanson and Dr. Leonard Kurland.

Dr. Nathanson received his medical degree from Harvard Medical School followed by two years of clinical training at the University of Chicago, followed by two years of epidemiology

the outbreak of a disease. The first step in analyzing whether there is a causal relationship between an event and the outbreak of a disease is to determine whether the causal relationship is biologically possible. Both plaintiff's experts and defendant's experts agree that it is biologically possible for the swine flu vaccination to cause GBS.

Because a causal relationship between the swine flu vaccination and GBS is biologically possible, the next inquiry is whether there is a statistically significant association between the vaccination and the outbreak of the disease. This association is determined by a mathematical computation that produces a ratio for the relative risk of contracting the disease. The relative risk ratio is computed by dividing the observed number of cases of a particular disease for a particular time period (numerator data) by the expected number of cases of that disease for the same time period based on historical information not influenced by the event in question (denominator data).

A relative risk of "1" is the expected rate of contracting a disease in a population not influenced by the event under investigation. A relative risk of "2" means that the disease occurs among the population subject to the event under investigation twice as frequently as the disease occurs among the population not subject to the event under investigation. Phrased another way, a relative risk of "2" means that, on the average, there is a fifty percent likelihood that a particular case of the disease was caused by the event under investigation and a fifty percent likelihood that the disease was caused by chance alone. A relative risk greater than "2" means that the disease more likely than not was caused by the event.

In the context of this case, the epidemiologists testifying for both plaintiff and defendant agree that if the relative risk of contracting GBS among the population receiving the swine flu immunization exceeds "2", it is more likely than not that the swine flu immunization caused the GBS.

1. The Cohort Analysis is the Appropriate Means to Evaluate the Relationship Between the Swine Flu Vaccine and the Incidence of GBS

The parties disagree about the best approach to analyze whether receiving a swine flu vaccination significantly enhanced the relative risk of contracting GBS. Defendant's epidemiologists analyzed the cumulative data for all GBS cases among the immunized population without regard to the date of vaccination. This analysis resulted in a log normal distribution showing a rapidly increasing rate of incidence among the immunized population peaking in the second or third week after receipt of the swine flu vaccination. Thereafter, the rate of incidence dropped until the sixth week when the rate of incidence of GBS reached a plateau consistent with the rate of incidence of GBS among the unimmunized population. The Langmuir panel report [6] (Defendant's Exhibit 26) relied on by the United States, assumed there

---

training at the Center for Disease Control. From 1957–1979, Dr. Nathanson was a member of the Johns Hopkins University faculty in the Department of Epidemiology. From 1979 to the time of trial, Dr. Nathanson was Chairman of the Department of Microbiology at the University of Pennsylvania Medical School.

Dr. Kurland received his medical degree from the University of Maryland, his master's degree in public health from Harvard University and his doctoral degree in epidemiology from Johns Hopkins University. Dr. Kurland trained in neurology at Mayo Clinic. He worked in the National Institute of Health Programs for the United States Public Health Service from 1946 to 1964 where he established a branch of epidemiology at the National Institute of Neurological Disease and Blindness. In 1964, Dr. Kur-

land went to the Mayo Clinic to establish a new Department of Epidemiology, Statistics and Population Genetics. Dr. Kurland currently is a Professor of Epidemiology and Chairman of the Department of Medical Statistics and Epidemiology at Mayo Clinic.

6. Both of defendant's epidemiological experts, Dr. Kurland and Dr. Nathanson, were members of this panel selected by the Justice Department to evaluate the relationship between the swine flu vaccine and GBS using data accumulated by the Center for Disease Control.

As a general matter, the Court is convinced that the panel did not perform as an independent body conducting a scientific examination. Whether inadvertently or intentionally, the panel's report is injected with the bias characteristic of experts retained by a party for purposes of

was no significant decline in reporting cases of GBS after December 18, 1976 (the date the swine flu vaccination program was halted).

Plaintiff's epidemiologist[7] and statistician primarily relied on the Mantel/Haenszel procedure (cohort analysis), the recognized and accepted method of statistical analysis for determining relative risk in stratified populations. A stratified population is any population in which an independent factor, such as age, distinguishes two otherwise comparable populations. The available data is stratified or broken into sub-groups or cohorts, and the relative risk for each cohort is analyzed independently. The relative risk for each group is then combined to arrive at a cumulative relative risk.

■■■ Defendant's epidemiologists concede that the cohort analysis and not the analytical approach followed by the Langmuir panel should be used if there was a significant drop in reporting GBS after December 18, 1976. Because the Court is convinced that there was a substantial drop in reporting after December 18, 1976, the cohort analysis is the most appropriate method for analyzing relative risk. *See* Plaintiff's Exhibit 183, Tables 20, 8, 9; Plaintiff's Exhibit 285, Tables 6, 7; Schoenberger report, Defendant's Exhibit 38, p. 109.

2. Application of the Cohort Analysis to the Available Epidemiological Data

To apply the cohort analysis to this case, the vacinees are separated into cohorts based on the calendar week of vaccination. The relative risk of getting GBS for each weekly cohort is then computed for any given incubation period. The relative risk of contracting GBS for each incubation period is then taken from each cohort and accumulated to arrive at a cumulative relative risk for any given incubation period.

To determine the relative risk of getting GBS 13 weeks after receiving a swine flu vaccination, the first step is to determine the observed number of GBS cases with onset of GBS occurring 11–16 weeks after the receipt of the swine flu vaccination (long onset cases). The parties disagree about the number of long onset GBS cases that occurred between October 1, 1976, and January 31, 1977. The Court is not persuaded by the panel's approach to determining the number of long onset cases. The Justice Department restricted the panel to single sheet computer printouts containing information about GBS cases reported by state health departments. In addition, the panel had a computer listing of 1,098 GBS cases with onset between October 1, 1976, and January 31, 1977. The Justice Department did not permit the panel to verify records, check apparent inconsistencies or investigate apparent typographical errors. As a result, the panel excluded 121 cases. *See* Langmuir panel report, Defendant's Exhibit 26, Table 1, p. 41; Nathanson's report, Defendant's Exhibit 36, Table 1; Defendant's Exhibit 191. Defendant's experts conceded that the restrictions placed on the panel by the Justice Department were contrary to their best judgment as epidemiologists.

In addition, the panel excluded 122 cases (Category E) (including a significant number of long onset cases) because the recorded data was insufficient to classify by extent of paralysis.[8] *See* Langmuir panel

litigation. Despite the exemplary qualifications of defendant's experts, it is clear that the opinion of each of them is biased by his role in the swine flu litigation.

7. Defendant throughout the proceeding attempted to cast doubt on the qualifications of plaintiff's experts, particularly Dr. Goldfield, because they had not published articles stating their views in peer review journals. Defendant's argument to reject the opinion of plaintiff's experts is not persuasive. Because the United States has chosen success in litigation over a full scientific investigation into the public health consequences of the swine flu vaccination program, Dr. Goldfield has been denied access to the factual information necessary for preparation of a scientific article stating his views. Further, certain peer review journals were controlled by defendant's experts. The Court was persuaded that Dr. Goldfield is a knowledgeable, dedicated epidemiologist.

8. According to Table 2 of the Langmuir paper (Defendant's Exhibit 26), the classifications were as follows:

report, Defendant's Exhibit 26, Table 2, p. 42; Nathanson's report, Defendant's Exhibit 36, Table 2; Defendant's Exhibit 192. Furthermore, the panel's method of classifying GBS cases by severity and excluding from consideration milder cases of GBS artifically reduced the relative risk for long onset cases. *See* Langmuir panel report, Defendant's Exhibit 26, Table 6, p. 46; Defendant's Exhibit 196.

Plaintiff's epidemiologist relied on a more complete data base. Consequently, he identified 31 cases of long onset GBS that were ignored by defendant's experts. Defendant's Exhibit 180.[9] During cross-examination, Dr. Goldfield conceded that

Case No. 1212 and Case No. 2237 are the same case and only one of them should be included as a long onset case. Tr. 8–67. Also, Case No. 2465 must be dropped because it was Manko's case. Although the United States challenges other cases in this group, the Court is convinced that these 29 cases were cases of GBS with onset occurring 11–16 weeks after immunization.

The total expected number of GBS cases occurring among the immunized population 11–16 weeks after vaccination, assuming no enhanced risk from the immunization, is 7.449 (the denominator component of the relative risk computation). *See* Plaintiff's Exhibit 285, Table 4.[10]

| Group | Extent of Motor Involvement | Number of Cases | Percent |
|---|---|---|---|
| | Extensive: paresis or paralysis of extremities plus trunk and/or cranial muscles: | | |
| A | with respiratory impairment | 303 | 32.1 |
| B | without respiratory impairment | 277 | 29.3 |
| | Limited: paresis or paralysis only: | | |
| C | 3 to 4 extremities | 173 | 18.3 |
| D | 1 to 2 extremities | 69 | 7.3 |
| E | Insufficient: the recorded data were either too limited in extent, or conflicting in character or simply recorded "unknown" thereby precluding any classification by extent of paralysis. | 122 | 12.9 |
| | Total | 944 | 100.0* |

\* The total percentage for groups A–E equals 99.9%, not 100%. However, the figures stated in this footnote are reported accurately from the Langmuir panel report.

9. Dr. Goldfield testified that he knew of two additional cases with the onset of GBS occurring 11–16 weeks after vaccination that were not contained in Plaintiff's Exhibit 180. However, during cross-examination, Dr. Goldfield could not identify these two cases and agreed to drop the two cases from his calculations. Tr. 9–79. Therefore, the two cases Dr. Goldfield referred to in his testimony have not been considered by the Court in determining that plaintiff established causation based on his epidemiological theory.

10. The total expected number of GBS cases for the weekly cohorts with onset occurring 11–16 weeks after vaccination is 7.449. *See* Plaintiff's Exhibit 285, Table 4.

| Calendar Week After Immunization | Total Expected Number of GBS Cases |
|---|---|
| 11 | 2.583 |
| 12 | 1.929 |
| 13 | 1.322 |
| 14 | .866 |
| 15 | .501 |
| 16 | .248 |
| | 7.449 |

The total expected number of GBS cases is calculated by adding the expected weekly number of GBS cases among the immunized cohorts for each weekly cohort. Plaintiff's Exhibit 285, Tables 3 and 4. The expected weekly number of GBS cases among the immunized cohorts is a function of the size of the immunized population for a given calendar week (Plaintiff's Exhibit 183, Table 3) multiplied by the attack rate for GBS onset during a particular calendar week. Plaintiff's Exhibit 183, Table 1.

Therefore, the relative risk of contracting GBS 11–16 weeks after vaccination is 3.89.[11] Because a viral illness can cause GBS and because plaintiff had a viral illness in early January 1977, this relative risk must be adjusted to accommodate the possibility that plaintiff's antecedent illness caused his GBS. Based on the mathematical computations of plaintiff's experts Dr. Goldfield and Dr. Mantel, assuming plaintiff had a viral illness in January 1977, the relative risk of contracting GBS 11–16 weeks after vaccination is 3.396.[12] See Plaintiff's Exhibit 332. Because the relative risk of contracting GBS during the period 11–16 weeks after vaccination is greater than 2, it is more likely than not that plaintiff's swine flu vaccination caused his GBS.

## F. Facts Resulting from Imposition of Discovery Sanctions Establish Beyond Dispute a Causal Connection Between Plaintiff's Vaccination and His GBS

Based on evidence presented in this case and on defendant's conduct throughout this case, the Court has concluded that the defendant's litigation posture has prevented a complete and thorough scientific analysis of why the swine flu immunization program caused an epidemic of GBS. For instance, one of defendant's epidemiologists, Dr. Kurland, agreed there is a cloud hanging over any future large scale immunization program as a result of the government's failure to evaluate the swine flu immunization program accurately. Consequently, many people will die who would have been saved by some of the remarkably effective vaccines available today. Tr. 16–207 to 16–209.

Defendant's attitude was graphically demonstrated by its refusal to comply with discovery orders intended to make available to plaintiff's experts crucial medical information. Specifically, the defendant refused to comply with the Court's Order to produce administrative claim forms with accompanying medical information filed under the Swine Flu Act. The medical information filed with the claim forms could provide valuable information about whether the claimants actually had GBS and, if so, when the GBS began in relation to the

Because the weekly attack rates shown in Plaintiff's Exhibit 183, Table 1 and the expected number of GBS cases in the immunized population shown in Plaintiff's Exhibit 285, Tables 3 and 4 are calculated from the actual number of cases of GBS in the unimmunized population during the period Ocotber 1, 1976, to January 31, 1977, there is no need to determine the general background risk of contracting GBS among the unvaccinated population, e.g., .44 (Olmstead County, Minnesota 1935–1980 study) (*see* Nathanson's report, Defendant's Exhibit 36, Table 7); .37 (Michigan study by Breman and Hayner) (*see* Nathanson's report, Defendant's Exhibit 36, Table 8; Defendant's Exhibit 21); .22 (Schonberger study) (Defendant's Exhibit 38).

11. The calculation of relative risk is set forth below.

$$\frac{29 \text{ (observed number of GBS cases among the immunized population occurring 11–16 weeks after receiving swine flue vaccination)}}{7.449 \text{ (expected number of GBS cases among the immunized population occurring 11–16 weeks after receiving swine flu vaccination)}} = 3.89 \text{ (the relative risk among immunized population of getting GBS 11–16 weeks after receipt of swine flue vaccination}$$

12. 3.89 (the relative risk among the immunized population of getting GBS 11–16 weeks after receipt of swine flu vaccination) x .873 (reduction in relative risk based on assumption that plaintiff had antecedent illness) = 3.396 (relative risk among immunized population of getting GBS 11–16 weeks after receipt of swine flu vaccination assuming antecedent illness)

date of vaccination. Rather than comply with the production order, the United States requested that the Court impose sanctions on it. Therefore, on November 29, 1983, the Court entered its Order [13] granting defendant's request to impose sanctions. The following sanctions were imposed:

[T]he defendant is precluded from contesting that if the administrative claim forms designated by plaintiff had been produced as ordered on July 8, 1983, and November 18, 1983, the following information would have been reflected therein:

1) Any claimant who alleged that he or she developed GBS peripheral neuropathy, polyneuropathy, polyneuritis, Landry Strohl Guillain-Barre Syndrome polyradiculoneuropathy, paralysis of more than one limb, weakness of more than one limb, and any claimant whose injury is not indicated on the administrative claim form, in fact, had GBS.

2) A claimant's statement on the administrative claim form produced for plaintiff that he or she was immunized with the Swine Flu vaccine will be presumed correct.

3) Any claimant who denies having been immunized on the claim form produced for plaintiff's inspection or who states facts on the claim form produced indicating that the claimant was not immunized, in fact, was not immunized. However, if the information on the claim form produced for plaintiff is unclear or nonexistent, such a claimant will be assumed to have stated that he or she was immunized.

4) A claimant's statement that he or she was immunized on a certain date will be presumed correct. If no date is set forth then defendant agrees not to contest a date of immunization which is consistent with other relevant factual information stated on the copy of the claim furnished to plaintiff. If no information is furnished on the claim form from which to make a reasonable inference of the immunization date, then defendant is precluded from contesting the immunization date assigned by plaintiff.

5) A claimant's statement on the administrative claim form produced for plaintiff's inspection that his or her GBS had its onset on a certain date will be presumed correct. If no onset date is indicated on a claim form then defendant will not contest a date of onset which is consistent with any other relevant factual information stated on the copy of the claim furnished to plaintiff. If no information is furnished on the claim form from which to make a reasonable inference about the onset date, then defendant is precluded from contesting the onset date assigned by plaintiff.

As a result of these sanctions, both plaintiff and defendant agree that a sufficient number of long onset cases are identified to cause the relative risk of contracting GBS thirteen weeks after receiving a swine flu vaccination to far exceed 2.

Therefore, plaintiff's GBS contracted in January 1977, was caused by the October 1976, swine flu vaccination.

## III.

## DAMAGES

Missouri law governs the determination of damages recoverable under the Federal Tort Claims Act because plaintiff received his swine flu vaccination in Missouri. *Overton v. United States*, 619 F.2d 1299, 1305 n. 5 (8th Cir.1980); *Pretre v. United States*, 531 F.Supp. 931, 934 (E.D.Mo.1981).

Under Missouri law plaintiff should be awarded an amount of money that will reasonably compensate him for his injuries. *Rickard v. Pratt*, 459 S.W.2d 13, 16 (Mo. App.1970). Plaintiff's age, the nature and extent of the injuries and losses, diminished working and earnings capacity, changing economic factors, the degree of injury or disability, the amount of pain and suffering, plaintiff's educational level and awards in cases involving similar injuries should be considered in determining plaintiff's dam-

---

13. A copy of the November 29, 1983, Order is attached hereto as Appendix 1.

ages. *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 945 (Mo.App.1978).

### A. *Pain and Suffering*

An element of plaintiff's damages is the pain, suffering and misery plaintiff has endured and is likely to endure in the future as a direct result of his GBS. *Mullendore v. Gentry*, 377 S.W.2d 494, 497–98 (Mo. App.1964).

When plaintiff was hospitalized at Menorah Medical Center on January 15, 1977, both of his legs and his left arm were paralyzed. By the third day of hospitalization, plaintiff was totally paralyzed except he could move his head from side to side approximately two inches. For approximately four weeks plaintiff suffered from severe paralysis. During this period of time, plaintiff had intermittent headaches, severe cramps in his legs and soreness in his shoulders due to the rapid deterioration of his muscles. Plaintiff's treatment during this period consisted of constant monitoring and painful passive therapy during which a physical therapist moved his limbs for him to prevent further deterioration. In addition, plaintiff endured painful medical procedures such as spinal taps.

By the end of January, 1977, plaintiff was able to sit up in bed for twelve minutes with the assistance of two people. On February 9, 1977, plaintiff got out of bed for the first time when he was taken to the physical therapy department on a hospital cart. By February 15, 1977, plaintiff could sit in a wheelchair for an hour. On February 21, 1977, plaintiff could roll from side to side in his bed with assistance. On March 11, 1985, plaintiff could move the toes of his left foot. On March 23, 1985, plaintiff stood between two parallel bars and took three steps with the assistance of three people. On April 4, 1977, plaintiff walked 250 feet between parallel bars with the assistance of two persons. On April 11, 1977, plaintiff walked 300 feet between parallel bars with the assistance of two persons. On April 18, 1977, plaintiff walked 350 feet between parallel bars with the assistance of two persons. On April 25, 1985, plaintiff stood from a sitting position with the assistance of two people. On April 26, 1977, plaintiff sat up from a lying position with the assistance of two persons. On May 3, 1977, plaintiff walked on crutches 230 feet with the assistance of two persons. On May 9, 1977, plaintiff walked 400 feet on crutches with the assistance of two people. On May 16, 1977, plaintiff raised himself to a sitting position from a side lying position without assistance and walked on crutches with the assistance of only one person. On June 9, 1977, plaintiff crawled eight to ten feet without assistance. On June 14, 1977, plaintiff stepped up a single step with the assistance of a therapist and parallel bars. On June 17, 1977, plaintiff was discharged from the hospital.

Physical pain and discomfort were present throughout plaintiff's five months in the hospital. In addition, he endured emotional pain and suffering including fear that he would not survive the illness, that he would be permanently paralyzed or crippled, that he would always be dependent on others for his basic daily needs, and that he would be unable to return to his job. Plaintiff often cried at night because he was frustrated, dependent and depressed.

When plaintiff was dismissed from the hospital on June 17, 1977, he could climb a step with the assistance of two people, crawl 45 feet although he needed assistance to raise his hips to a crawling position, slide from a wheelchair to a commode, and walk with crutches on a carpeted surface with the assistance of one person. Plaintiff needed assistance to shave, use the bathroom, feed himself, get out of bed and dress himself.

After plaintiff arrived home and realized that he would no longer have the constant care he was used to, he became hysterical and wanted to return to the hospital.

Although plaintiff adjusted quickly to being at home, the first six months at home were physically and emotionally draining. Plaintiff could only move around in a wheelchair or a commode chair. He had to be pulled or lifted from his bed to the chair. He was unable to dress unless someone put his pants on, buttoned his shirt, tied his ties

and put on his socks and shoes. Plaintiff constantly dropped things because of the weakness and tremors in his hands. In order to bathe, someone had to pull plaintiff across a slide board from his wheelchair to a high shower stool. Then plaintiff needed assistance in washing himself.

During this period of time, an attendant spent five to six hours a day assisting plaintiff. The rest of the time, plaintiff was assisted by his wife, his stepson and occasionally by a maid.

On June 20, 1977, plaintiff began physical therapy on an out-patient basis at Menorah Medical Center. When plaintiff began physical therapy as an out-patient, he had poor to fair muscle strength in his lower extremities, required maximum assistance to come to a standing position and could get in and out of a chair with assistance and a sliding board. According to the director of the rehabilitation institute, plaintiff always pushed himself resulting in many falls.

As plaintiff's physical condition gradually improved, he began walking with crutches and with the help of an attendant. The attendant walked behind plaintiff holding onto a belt strapped around plaintiff's waist. Nevertheless, plaintiff fell many times.

In January, 1978, plaintiff went to Palm Springs for three months. Plaintiff continued physical therapy at Eisenhower Medical Center. Plaintiff still used the wheelchair but he practiced walking with crutches. Plaintiff continued to fall frequently. Substantial improvement occurred during that winter in Palm Springs. For instance, by the time he left Palm Springs, he could dress himself except for his shoes and socks and he no longer used the wheelchair.

In July, 1978, plaintiff had to use the arms of a chair to lift himself; he could walk up and down three steps using one cane and the railing and he could walk with two canes for limited distances. When plaintiff walked, his knees would snap back because of weakness in the knee muscle. By the end of July, plaintiff could lift twenty pounds. By the end of August, plaintiff could walk up and down ten stair steps and he could tolerate the exercise session with rest periods in between the various exercises. By September, plaintiff could stand without assistance if there was no external force such as the jostling of a crowd. However, plaintiff had footdrop and a steppage gait due to weak muscles in his ankles causing him to lift his foot up high for each step so his foot could clear the floor. By December, 1978, plaintiff's standing balance had improved but he still could not maintain his balance if jostled by someone in a crowd.

Plaintiff was discharged from outpatient physical therapy in January, 1979. At that time plaintiff needed two canes to walk; his knees still snapped back when he walked; and he could only walk up and down ten stair steps.

In January, 1979, plaintiff returned to Palm Springs. By this time he could get in and out of chairs and completely dress himself. However, he continued to need a cane to walk. Physical therapy continued at the Eisenhower Institute.

After plaintiff's return to Kansas City, physical therapy resumed at the Menorah Rehabilitation Institute. Plaintiff still had footdrop, slapfoot gait and balance problems. His endurance had improved so that he could complete the therapy session without rest periods between each exercise. Plaintiff gradually improved until he was released in January, 1980. If plaintiff missed a therapy session his strength and endurance decreased.

During the period from June 1977, to early 1980, plaintiff suffered continuous pain particularly when he exercised and during the physical therapy sessions. As a result of plaintiff's neurological impairments, he will always have pain and cramping in his legs. Plaintiff's impaired sensation causes his legs to tingle and burn constantly similar to the sensation one feels when a foot starts to come back after it has fallen asleep. Furthermore, plaintiff suffered and continues to suffer emotional distress as a result of his condition. Plaintiff has had to adjust to the reality that he

would not be able to do many of the things he enjoyed doing before he had GBS. For instance, plaintiff started playing golf when he was nine years old and was an avid golfer in 1976. In 1981, plaintiff attempted to play golf with his wife holding him for balance. However, he fell every time he swung the club. Plaintiff now plays a limited golf game with assistance. When plaintiff and his wife go to social events, they usually must return early because he gets tired. He avoids crowded places, e.g., restaurants, sporting events, and the theatre because he has been jostled and knocked down on numerous occasions. Plaintiff can no longer dance.

■■■■ The onset of plaintiff's GBS occurred over nine years ago and plaintiff's life expectancy is nine years from his present age. The Court finds that the sum of $250,000 is an appropriate amount to compensate plaintiff for living eighteen years with the pain and suffering, mental anguish and loss of enjoyment of life directly caused by the GBS.

### B. Permanent Disability

■■■■ The nature, character and extent of the effects of GBS on plaintiff is an element of damage independent of pain and suffering. *Slusher v. United Electric Coal Companies*, 456 S.W.2d 339, 341 (Mo. 1970).

Plaintiff has a residual neurological deficit as a direct result of his GBS. As a result, plaintiff's gait is obviously impaired requiring the use of a cane. Plaintiff's awkwardness is caused by the lack of muscle power in his legs and by the impaired sensation in his feet and ankles. Plaintiff cannot stand on his toes, stand on his heels, tap his feet or arise from a squat position without using his hands for balance. Plaintiff must use his arms to push himself out of a chair. Plaintiff's ankles are frequently swollen. Plaintiff has no deep tendon reflex in the lower extremities. As a result of these physical limitations, plaintiff must sit on a shower stool to bathe because he could slip and fall if he attempted to take a shower while standing. He can only walk for a block before his legs start cramping. Occasionally painful leg cramps keep him

awake at night. He must use one cane when he walks. He must use his cane and the guardrail to climb stairs. Plaintiff cannot sit or stand for longer than one hour.

As a result of weakness and awkwardness plaintiff is more likely to fall. For instance, in 1982 plaintiff broke his ankle because he lost his balance due to his instability. As a result of the broken ankle, plaintiff's right leg is weaker. Also, he suffers from post traumatic arthritis in his ankle.

The skin on plaintiff's feet and lower legs is mottled in appearance ranging in color from pink to red to purplish resulting from permanent damage to the autonomic nerve fibers that keep the tone in the blood vessels.

Plaintiff cannot plantarflex (curl down the toes) or dorsiflex (lift the toes upwards). This means that plaintiff cannot wiggle his toes to stir up his circulation. Further, plaintiff has limited circulation in his legs causing them to feel numb and cold. He has constant numbness and tingling in his feet.

Plaintiff still falls about once a week because of the weakness in his legs, his unsteady gait, lack of balance and footdrop. If plaintiff falls, he cannot get up unless there is a rail or stool nearby so he can pull himself up.

Plaintiff has difficulty gripping with his hands. Also, he has a noticeable tremor and weakness in his hands. As a result, he cannot perform basic daily tasks such as buttoning shirts, tying ties, opening bottles or jars, turning door knobs or using a screwdriver. He cannot write for more than half a page. There is weakness of the intrinsic muscles of the hands making it difficult for him to spread his fingers apart and pull them back together. Plaintiff cannot hold his little finger and thumb in opposition to each other. In addition, plaintiff has reduced sensitivity in his fingertips causing plaintiff to drop things.

Further, as a direct result of GBS, plaintiff will suffer greater functional regression if he becomes ill or bedridden for any

reason than would a person who had not had GBS. As demonstrated by his slow recovery from the broken ankle, plaintiff has more difficulty regaining his previous degree of mobility after an illness or injury than a normal person would.

■ Plaintiff claims compensation for bladder and bowel dysfunction. However, the Court is not persuaded that plaintiff has suffered or continues to suffer bladder and bowel dysfunction. For instance, the testimony about these impairments was general and vague when compared to the precise testimony of both plaintiff and his wife about plaintiff's other impairments. Therefore, no compensation will be awarded for plaintiff's alleged bowel and bladder dysfunction.

Prior to becoming ill with GBS, plaintiff had a full and satisfying sexual relationship with his wife. In November and December, 1976, when plaintiff began suffering from GBS, plaintiff's ability to participate in a sexual relationship began to decline. During his five months in the hospital, plaintiff and his wife had no sexual relationship. Since plaintiff's release from the hospital, plaintiff has not been able to participate in a satisfying sexual relationship.

From early 1981, the medical records reflect that plaintiff has been completely and organically impotent. A cystometrogram performed by Dr. Leifer, plaintiff's urologist, on December 21, 1983, confirms that plaintiff's impotence resulted from neurogenic dysfunction caused by GBS. In addition, the nocturnal penile tumescence (NPT) study and the Doppler penile blood pressure study performed at Mayo Clinic at defendant's request demonstrate that plaintiff suffers from organic impotence.

■ Defendant argues that plaintiff does not suffer from organic impotency caused by GBS because Dr. Leifer's medical records indicate that at various times since June 1977, plaintiff has had a sexual relationship with his wife. Although Dr. Leifer's records contain some entries to that effect (Defendant's Exhibit 401), Dr. Leifer testified that he did not believe that plaintiff had had a satisfactory sexual experience after the onset of his GBS. According to Dr. Leifer, men of plaintiff's age suffering from impotency frequently make exaggerated statements of their improved sexual ability to induce their physician to continue treatment such as the hormone shots plaintiff received from June 1978, to December 1980. Given the neurological deficit caused by GBS, Dr. Leifer's explanation based on his experience is a persuasive explanation of plaintiff's statements.

■ Defendant also argues that it is not medically possible for GBS to cause impotency. However, based on the testimony of plaintiff's expert, Dr. Lichtenfield, the Court is convinced that GBS can cause and in this case did cause autonomic dysfunction resulting in impotency.

■ The onset of plaintiff's GBS occurred over nine years ago and plaintiff's life expectancy is nine years from his present age. The Court finds that $275,000 is an appropriate amount to compensate plaintiff for living eighteen years with the permanent disability resulting from GBS.

### C. *Medical Expenses*

■ Plaintiff may recover the reasonable value of medical and hospital expenses directly caused by the swine flu vaccination and which have been incurred or are reasonably certain to be incurred in the future. *Wilcox v. Swenson,* 324 S.W.2d 664, 672–73 (Mo.1959).[14]

The parties entered into a stipulation regarding medical expenses that lists the claimed medical expenses and defendant's

---

14. On November 26, 1984, the United States filed a lengthy brief setting forth the standards for determining whether an expense is deductible as a medical expense under the Internal Revenue Code and analyzing whether the expenses requested by plaintiff met those standards. The United States offers no explanation why the Internal Revenue Service standards are appropriate for determining whether an expense is a medical expense in this case. Therefore, the standards under Missouri law, not under the Internal Revenue Code, have been applied.

objection, if any, to each expenditure. Defendant's Exhibit 463. Medical expenses in the amount of $31,386.36 were not objected to in whole or in part by defendant. The medical expenses defendant challenged are discussed below.

### 1. Additional Airfare: Chicago to Kansas City, January 14, 1976

■ On January 14, 1977, the Mankos paid $106 more than the coach fare to fly first class from Chicago to Kansas City. Defendant asserts that this amount was not documented. Sylvia Manko testified that in order to get an immediate flight back to Kansas City, they had to purchase first class tickets and that the difference in cost was $106. The claimed amount is a reasonable and necessary medical expense.

### 2. Special Nursing

The defendant argues that $11,450.26 spent by plaintiff for special nursing care while he was in the hospital is not a medically necessary expense. From January 15, 1977, to February 14, 1977, plaintiff had around the clock private nursing pursuant to orders from his attending physician. Private nurses were necessary because plaintiff's breathing and vital functions needed constant monitoring and because plaintiff could not move without assistance.

On February 14, 1977, plaintiff was transferred to a private room with group nursing care. In group nursing several nurses are responsible for a limited number of patients. Specific nurses were assigned to take care of plaintiff. Plaintiff's doctor reasonably believed that plaintiff needed this increased level of nursing care.

■ Therefore, the $11,450.26 paid for special nursing care was a reasonable and necessary medical expense directly caused by GBS.

### 3. Prescription Medication

The parties have stipulated that plaintiff spent $523.24 for prescription drugs during the period 1977–1984.[15] The United States contends that plaintiff has failed to demonstrate that GBS caused the need for these drugs. Plaintiff established that in 1979 his physician prescribed Triavil ($6.36) and Atavan ($11.93) for treatment of insomnia caused by his GBS. From 1982–1984, plaintiff's physician prescribed Inderal ($153.98) and Dyazide ($49.61). Only one-half of the amount spent on Inderal and Dyazide will be awarded because these drugs were prescribed for a condition caused by GBS (leg cramps) and for a condition unrelated to GBS (hypertension). Although other prescriptions are identified in Defendant's Exhibit 463, there is no basis for concluding that they were prescribed as a result of GBS.

■ Therefore, prescription drugs costing $120.09 were reasonable and necessary medical expenses directly caused by GBS.[16]

### 4. Equipment for Home Use

When plaintiff came home from the hospital, he needed certain equipment, e.g., a wheelchair, a commode chair, weights and exercise equipment.

■ Plaintiff asserts that $357.40 was spent on rental or purchase of this equipment. Defendant concedes that $278.58 was appropriately spent but objects to $78.82 because this amount is not documented. Plaintiff has failed to establish that an amount greater than $278.58 was spent for equipment in 1977. Therefore, $278.58 was a reasonable and necessary medical expense directly caused by GBS.

**15.** Plaintiff spent the following amounts for prescription medications:

| Year | Amount |
|------|--------|
| 1977 | $4.66 |
| 1978 | 61.81 |
| 1979 | 136.62 |
| 1980 | 108.70 |
| 1982 | 57.08 |
| 1983 | 87.59 |
| 1984 | 66.78 |
| Total | $523.24 |

**16.** Computation of the amount recoverable for prescription drugs:

| | |
|---|---|
| Triavil | $6.36 |
| Atavan | 11.93 |
| Inderal | 76.99 |
| Dyazide | 24.81 |
| Total | $120.09 |

### 5. Post-Hospitalization Visits to Dr. Statland

■■■ The parties have stipulated that plaintiff spent $2,261.75 on visits to his treating physician after he was released from the hospital on June 17, 1977.[17] Based on the testimony of plaintiff and Dr. Statland, and on the medical records, the Court finds that the entire amount spent in 1977 and 1978 was a reasonable and necessary medical expense. In addition, one-half the amounts spent thereafter were reasonable and necessary medical expenses directly caused by GBS because the residual deficits of plaintiff's disease made it necessary for him to see his physician more frequently than he did before he became ill. Therefore, $1,370.88 is a reasonable and necessary medical expense directly caused by GBS.[18]

### 6. Urologist Charges

■■■ The parties have stipulated that plaintiff paid urologist Dr. Leifer $2,188 during the period 1978–1981.[19] Defendant

**17.** By stipulation the parties agree that the following amounts were paid to Dr. Statland after plaintiff was released from the hospital on June 17, 1977.

| Year | Cost |
|------|------|
| 1979 | $175.50 |
| 1978 | 304.50 |
| 1979 | 323.50 |
| 1980 | 315.75 |
| 1981 | 324.50 |
| 1982 | 487.00* |
| 1983 | 331.00 |
| Total | $2,261.75 |

* Plaintiff paid Statland Clinic $687 in 1982 of which $200 was for treatment of plaintiff's broken ankle. The broken ankle is discussed later.

**18.** Expenses for visits to the Statland Clinic that were directly caused by GBS are as follows:

| Year | Amount |
|------|--------|
| 1977 | $175.50 |
| 1978 | 304.50 |
| 1979 | 161.75 |
| 1980 | 157.88 |
| 1981 | 162.25 |
| 1982 | 243.50 |
| 1983 | 165.50 |
| Total | $1,370.88 |

**19.** The amounts paid to Dr. Leifer for treatment of impotency were:

argues that the visits to Dr. Leifer were not caused by GBS. Plaintiff went to Dr. Leifer for treatment of his impotency. For the reasons stated earlier in this Order, plaintiff's impotency was caused by his GBS. Therefore, the $2,188 paid to Dr. Leifer were reasonable and necessary medical expenses directly caused by the GBS.

### 7. Radiologists, Inc.

■■■ The parties have stipulated that $208 was paid to Radiologists, Inc. in the period 1978 through 1983.[20] Defendant objects to these expenditures because they are not documented. Defendant's objections are well taken. Plaintiff has failed to establish that the amount paid Radiologists, Inc. was either reasonable, necessary or directly caused by GBS.

### 8. Trips South in the Winter

The parties have stipulated that plaintiff spent $35,249.28 on winter trips to a warmer climate in the period 1978 through 1984.[21] The United States argues that

| Year | Amount |
|------|--------|
| 1978 | $598.00 |
| 1979 | 504.00 |
| 1980 | 660.00 |
| 1981 | 426.00 |
| Total | $2,188.00 |

**20.** The amounts paid to Radiologists, Inc. were:

| Year | Amount |
|------|--------|
| 1978 | $24.00 |
| 1979 | 27.00 |
| 1980 | 35.00 |
| 1981 | 38.00 |
| 1982 | 41.00 |
| 1983 | 43.00 |
| Total | $208.00 |

**21.** The amounts paid for trips to a warmer climate in the period 1978 through 1984 were:

| Year | Trip | Expense |
|------|------|---------|
| 1978 | Palm Springs | |
| | Car rental | $98.85 |
| | Rent | 5,280.00 |
| | Airline tickets | 878.00 |
| | | $6,256.85 |
| 1979 | Palm Springs | |
| | Condo rent | $3,385.00 |

these expenditures were neither reasonable nor medically necessary.

Dr. Statland, plaintiff's treating physician, directed plaintiff to go to a more moderate climate for the winters of 1977–78, 1978–79, 1979–80, because it was essential to his recovery that he continue to receive regular physical therapy. Had he remained in Kansas City during these winters, plaintiff would have been unable to leave the house in bad weather thereby disrupting his regular and essential physical therapy sessions. He would not have achieved maximum recovery if he had remained in Kansas City during those three winters. Therefore, it was medically necessary that plaintiff spend the winters of 1977–78, 1978–79, and 1979–80, in a warmer climate.

The United States argues that the expenses claimed for those years are not reasonable because a condominium could have been rented someplace other than Palm Springs. Undoubtedly, defendant is correct that less expensive condominiums were available. However, the amounts spent by plaintiff on lodging in those years were reasonable because the facilities accommodated someone in plaintiff's condition and because the apartments were accessible to the place where plaintiff received physical therapy.

After 1980, plaintiff continued to spend winters in either California or Florida at the direction of Dr. Statland. The Court is not convinced that those trips were necessary treatment for plaintiff's GBS or were necessary to maintain the level of recovery achieved.

Therefore, the expenditure of $13,864.50 for winter trips was a reasonable and necessary medical expense directly attributable to plaintiff's GBS.[22]

9. Broken Ankle and Lacerated Toe

The parties have stipulated that plaintiff incurred medical bills in the amount of $103.10 for a lacerated toe in 1980,[23] and $3,987 for a broken ankle in 1982.[24] Defendant argues that these expenses were not a direct result of plaintiff's GBS.

In 1980, plaintiff fell in the bathroom nearly severing his toe.

In August, 1982, plaintiff went to the golf course with friends and rode in a golf cart. When he got out of the cart to get a drink from a water fountain, he lost his balance and fell, breaking his ankle in three places. Plaintiff was hospitalized for several days and his leg up to the hip was

| Year | Trip | Expense |
|------|------|---------|
| 1980 | Palm Springs | $ |
| | Send clothing | 97.65 |
| | Condo rent | 4,125.00 |
| | | $4,222.65 |
| 1981 | Florida | |
| | Condo rent | 4,800.00 |
| | Send clothing | 116.00 |
| | | $4,916.00 |
| 1982 | California | |
| | Condo rent | $4,800.00 |
| 1983 | California | |
| | Send clothing | 40.16 |
| | Airline tickets | 222.00 |
| | Car driver | 250.00 |
| | Condo rent | 5,775.00 |
| | | $6,287.16 |
| 1984 | California | |
| | Airline tickets | 270.00 |
| | Send clothing | 158.12 |
| | Driver | 356.00 |
| | Condo rent | 4,437.50 |
| | Return flight | 160.00 |
| | | $5,381.62 |
| | Total | $35,249.28 |

**22.** Expenses for winter trips directly attributable to plaintiff's Guillain Barre Syndrome:

| Year | Amount |
|------|--------|
| 1978 | $6,256.85 |
| 1979 | 3,385.00 |
| 1980 | 4,222.65 |
| Total | $13,864.50 |

**23.** Expenses related to plaintiff's lacerated toe in 1980:

| Expense | Amount |
|---------|--------|
| Marcus Lawrence Hospital | $ 59.20 |
| Dr. Bordennore | 43.90 |
| | $103.10 |

**24.** Expenses related to plaintiff's broken ankle:

| Expense | Amount |
|---------|--------|
| Mid America Orthopedic | $1,042.00 |
| Dr. Statland | 200.00 |
| Menorah Hospital | 2,383.00 |
| Abby Rents Walker | 30.00 |
| Orthopedic Service (brace) | 240.00 |
| Mid America Orthopedic | 92.00 |
| Total | $3,987.00 |

in a balloon cast from August 20, 1982, to October 15, 1982. Plaintiff had to return to physical therapy to help him recover from this injury.

██ Both of these injuries resulted from the instability caused by GBS. Therefore, the expenses related to his lacerated toe in 1980 ($103.10) and his broken ankle in 1982 ($3,987) were directly caused by GBS and are reasonable and necessary expenses.

### 10. Services Rendered by Family

██ Plaintiff requests compensation for the time spent by members of his family in taking care of him. No doubt the lives of certain members of plaintiff's family were dramatically affected by plaintiff's disease and resulting disability. For instance, plaintiff's wife and stepson spent significant amounts of time taking care of plaintiff. However, plaintiff was not charged by his family members for their services. Therefore, plaintiff is not entitled to an award of damages for time spent by his family members in assisting him.

### 11. Redecorating

Plaintiff claims that he had to redecorate portions of his home in December 1980, because of damage inflicted as a direct result of his condition. For instance, plaintiff asserts that the wheelchair caused damage to furniture, cabinets and door frames; that furniture and carpet were stained from food and drink that plaintiff spilled because of his unsteadiness and weakness; and that plaintiff knocked over and broke several pieces of furniture, china and crystal. Plaintiff claims $6,500 as the cost of the redecorating required to correct this damage.

██ Undoubtedly, the use of plaintiff's wheelchair and his unsteadiness caused some damage to his home. However, the Court is not persuaded that the entire redecorating expense was necessary to correct damage caused by plaintiff's GBS. The Court finds that $3,000 was necessary to redecorate plaintiff's home as a result of damage inflicted by plaintiff's condition.

### 12. Future Medical Expenses

██ Between 1980 when plaintiff reached his maximum recovery level and 1983, plaintiff expended on the average $190.42 per year on medical expenses directly attributable to the GBS. Based on the evidence, plaintiff can reasonably be expected to pay at least this much on the average for each year he lives to obtain treatment required by the effects of GBS. Based on the fact that plaintiff was 72 years old in January 1984, plaintiff had a life expectancy of 10.1 years in 1984. *See* Defendant's Exhibit 430. Therefore, plaintiff will be awarded $1,923.24 to compensate him for future medical expenses that are reasonably expected to be incurred.[25]

### 13. Summary of Compensable Medical Expenses

For the reasons stated, plaintiff shall be awarded $69,778.01 for past and future medical expenses directly caused by plaintiff's GBS.[26]

---

25.

|  Statland Clinic<br>Annual Medical Expenses Directly Attributable to GBS 1981–1983<br>(See footnote 17) | |
| --- | --- |
| 1981 | $162.25 |
| 1982 | 243.50 |
| 1983 | 165.50 |
|  | $571.25 |

Average 1981–1983 = $571.25/3 = $190.42

$1,923.24 (Total future medical expenses directly attributable to GBS)

$190.42 (Average Annual Expenses) x 10.1 years (Expected Life) = $1,923.24

26. Total award for medical expenses:

| | |
| --- | --- |
| Stipulated Amount | $31,386.36 |
| Additional Airfare | 106.00 |
| Special Nursing | 11,450.26 |
| Prescription Medication | 120.09 |
| Equipment for Home Use | 278.58 |
| Post Hospital Doctor Visits to Dr. Statland | 1,370.88 |
| Urologist Charges | 2,188.00 |
| Trips South in Winter | 13,864.50 |
| Broken Ankle/Lacerated Toe | 4,090.10 |
| Redecorating | 3,000.00 |
| | $67,854.77 |
| Future Medical Expenses | 1,923.24 |
| Total Medical Expenses | $69,778.01 |

## D. *Lost Earnings*

Plaintiff began working as a traveling salesman in the ladies apparel industry in 1939 and worked continuously in that industry (except for time spent in the military service from 1942–1946) until 1977. Plaintiff began working for R & M Kaufman in 1947 as a sales representative. In 1973, R & M Kaufman reorganized and plaintiff became a regional sales manager.

In early December 1976, plaintiff was offered and accepted the position of national sales manager. Plaintiff began work as national sales manager on January 1, 1977, about two weeks before the onset of the acute phase of his GBS. The terms of plaintiff's employment as national sales manager were 1) a base salary of $50,000 per year; 2) a one percent commission on net sales for Kansas and Missouri; 3) contribution to plaintiff's pension fund at the then current level or if his earnings increased at an increased level; 4) payment of the rental on an apartment in Chicago; and 5) a one percent commission on the increase in national sales above 1976.

R & M Kaufman does not have a mandatory retirement age. The company knew plaintiff's abilities from his years of service. Based on his experience with R & M Kaufman and the confidence the company had in him, plaintiff would have worked as national sales manager until he chose to retire had he not contracted GBS. Plaintiff asserts that he would have worked until age 75. Based on all of the evidence about the relationship between plaintiff and his wife, based on their active social life when plaintiff was home, based on Sylvia Manko's lack of enthusiasm for moving to Chicago thereby guaranteeing a continuation of prolonged absences from each other, based on the heavy demands of being national sales manager and based on the reasonable conclusion that plaintiff would have wanted some relief from the hectic pace and pressure of his job as he got older, it is more likely that plaintiff would have retired in 1982 at the age of 70.

■ As a result, plaintiff's total loss of earnings directly caused by his GBS is computed as follows:

| Year | Base Salary [27] | Comm. National Sales [28] | Comm. Mo-Kan Sales [29] | Employers Pension Contribution [30] | Lost Earn. on Pension Contrib. [31] | Total |
|------|------------------|---------------------------|-------------------------|-------------------------------------|-------------------------------------|-------|
| 1977 | 50,000 | –0– | 10,556 | 2,725 | 2,032 [32] | 65,313 |
| 1978 | 53,000 | 41,250 | 13,575 | 4,852 | 3,202 [33] | 115,879 |
| 1979 | 56,180 | 94,690 | 14,448 | 7,439 | 4,238 [34] | 176,995 |
| 1980 | 59,551 | 54,380 | 13,755 | 5,746 | 2,739 [35] | 136,171 |
| 1981 | 63,124 | 34,479 | 12,881 | 4,972 | 1,879 [36] | 117,335 |
| 1982 [38] | 3,854 [39] | 371 | 627 | 218 | 61 [37] | 5,131 |
| Total | $285,709 | $225,170 | $65,842 | $25,952 | $14,151 | $616,824 |

Total Lost Earnings .......... 616,824
Less Salary Paid by R & M Kaufman in 1977 [40] .......... 40,160
Lost Earnings .......... $576,664 [41]

**27.** The computations for plaintiff's base salary are based on a $50,000 base annual salary for the first year as national sales manager with six percent annual increases.

**28.** As national sales manager, plaintiff would have received a one percent commission on the increase in net national sales above the 1976 actual sales. The parties stipulated (Defendant's Exhibit 458) that net national sales for R & M Kaufman were as follows:

| Year | Amount | Comparison to 1976 | Commission |
|------|--------|--------------------|------------|
| 1976 | $28,178,000 | N/A | –0– |
| 1977 | 25,124,000 | [3,054,000] | –0– |
| 1978 | 32,303,000 | 4,125,000 | $41,250 |
| 1979 | 37,647,000 | 9,469,000 | 94,690 |
| 1980 | 33,616,000 | 5,438,000 | 54,380 |
| 1981 | 31,625,875 | 3,447,875 | 34,479 |
| 1982 | 28,822,906 | 644,906 | 371* |

* 1% of $644,906 = $6,449 x 5.76% (part of year before plaintiff's 70th birthday) = $371.

**29.** As national sales manager, plaintiff would have received a one percent commission on net sales for Missouri and Kansas. The parties stipulated (Defendant's Exhibit 458) that net Missouri/Kansas sales were as follows:

| Year | Net Mo-Kan Sales | Commission |
|------|------------------|-----------|
| 1977 | $1,055,622 | $10,556 |
| 1978 | 1,357,525 | 13,575 |
| 1979 | 1,444,768 | 14,448 |
| 1980 | 1,375,475 | 13,755 |
| 1981 | 1,288,090 | 12,881 |
| 1982 | 1,087,773 | 627* |
| Total | $7,609,253 | $65,842 |

\* 1% of $1,087,773 = $10,878 x 5.76% (part of year before plaintiff's 70th birthday) = $627

**30.** Under the R & M Kaufman pension plan applicable to plaintiff, the company would have contributed annually to the company pension plan on behalf of plaintiff four and one-half percent of plaintiff's annual compensation.

| Year | Annual Compensation | Employer's Pension Contribution |
|------|---------------------|----------------------------------|
| 1977 | $ 60,556 | $ 2,725 |
| 1978 | 107,825 | 4,852 |
| 1979 | 165,318 | 7,439 |
| 1980 | 127,686 | 5,746 |
| 1981 | 110,484 | 4,972 |
| 1982 | 4,852 | 218 |
| Total | $576,721 | $25,952 |

**31.** The parties stipulated (Defendant's Exhibit 459) that the R & M Kaufman pension plan had the following rates of return:

| Time Period | Rate |
|-------------|------|
| 6/1/76–11/1/78 | 8.5% |
| 11/1/78–5/31/79 | 8.95% |
| 6/1/79–12/31/79 | 9.10% |
| 1980 | 9.30% |
| 1981 | 9.87% |
| 1982 | 9.70% |
| 1983 | 9.45% |
| 1984 | 9.20% |

The computation of lost earnings on pension contributions made by plaintiff's economist Dr. Ward has been rejected because his calculations assume that the employer's pension contributions were based solely on plaintiff's base salary. The parties stipulated that the company would have made an annual contribution of four and one-half percent of plaintiff's *total* annual compensation to the company pension plan.

The lost earnings on pension contributions determined by the Court are based on the employer's pension contribution (four and one-half percent of the total annual compensation) calculated as simple interest at the stipulated rate of return from the end of the calendar year in which the pension contribution would have been made to December 30, 1985. The average

of the stipulated rates of return for 1982–1984 has been used as the rate of return for 1985.

**Calculation of Average Rate of Return**

| 1982 | 9.7% |
|------|------|
| 1983 | 9.45% |
| 1984 | 9.2% |
| | 28.35% |

Average rate of return = 28.35/3 = 9.45%.

**32.**

**Lost Earnings on 1977 Employer's Pension Contribution**

| Year | Computation of Earnings | Earnings |
|------|-------------------------|----------|
| 1978 | [8.5% x 10/12 (interest from 1–1–78 to 10–31–78) x 2725] + [8.95% x 2/12 (interest from 11–1–78 to 12–31–78 x 2725] + | $ 233.67 |
| 1979 | [8.95% x 5/12 (interest from 1–1–79 to 5–31–79) x 2725] + [9.10% x 7/12 (interest from 6–1–79 to 12–31–79) x 2725] | 246.27 |
| 1980 | 9.3% x 2725 | 253.43 |
| 1981 | 9.87% x 2725 | 268.96 |
| 1982 | 9.7% x 2725 | 264.33 |
| 1983 | 9.45% x 2725 | 257.51 |
| 1984 | 9.2% x 2725 | 250.70 |
| 1985 | 9.45% x 2725 | 257.51 |
| Total | | $2,032.38 |

**33.**

**Lost Earnings on 1978 Employer's Pension Contribution**

| Year | Computation of Earnings | Earnings |
|------|-------------------------|----------|
| 1979 | [8.95% x 5/12 (interest from 1–1–79 to 5–31–79) x 4852] + [9.10% x 7/12 (interest from 6–1–79 to 12–31–79) x 4852] | $ 438.50 |
| 1980 | 9.3% x 4852 | 451.24 |
| 1981 | 9.87% x 4852 | 478.89 |
| 1982 | 9.7% x 4852 | 470.64 |
| 1983 | 9.45% x 4852 | 458.51 |
| 1984 | 9.2% x 4852 | 446.38 |
| 1985 | 9.45% x 4852 | 458.51 |
| Total | | $3,202.67 |

**34.**

**Lost Earnings on 1979 Employer's Pension Contribution**

| Year | Computation of Earnings | Earnings |
|------|-------------------------|----------|
| 1980 | 9.3% x 7439 | $ 691.83 |
| 1981 | 9.87% x 7439 | 734.23 |
| 1982 | 9.7% x 7439 | 721.58 |
| 1983 | 9.45% x 7439 | 702.99 |
| 1984 | 9.2% x 7439 | 684.39 |
| 1985 | 9.45% x 7439 | 702.99 |
| Total | | $4,238.01 |

▆ Plaintiff requested recovery for lost investment income based on the parties' stipulation that plaintiff invested an average of fifteen percent of his yearly adjusted gross income. There is no evidence in the record of what plaintiff's yearly adjusted gross income would have been. Dr. Ward, plaintiff's economist, based his computation on plaintiff's gross base salary without making any adjustments. Based on plaintiff's prior tax returns, he routinely had adjustments to gross income. Any attempt by the Court to estimate how plaintiff's adjustments to gross income would have been effected by his increased income would be mere speculation. Therefore, the award for loss of earnings does not include any recovery for lost investment income.

▆ Plaintiff also seeks recovery for the contributions R & M Kaufman would have made 1) to Social Security for retirement benefits; 2) to the company health insurance plan; and 3) to plaintiff as reimbursement for food expenses while he was away from home. Plaintiff has failed to establish that he has suffered any loss as a result of these amounts not having been paid. For instance, the absence of contributions to Social Security after 1976 did not cause a reduction in Social Security retirement benefits. Further, plaintiff failed to demonstrate that he paid medical bills that would have been paid by the company health insurance plan if R & M Kaufman had continued to pay its share of his insurance premiums. Finally, plaintiff failed to establish what he paid for food that would have been paid by his company had be continued to work. Therefore, these items will not be included in the damage award.

### E.  *Collateral Source Rule*

The United States argues that any past or future medical expenses awarded to plaintiff should be offset by amounts paid

**35.**

Lost Earnings on 1980 Employer's Pension Contribution

| Year | Computation of Earnings | Earnings |
|---|---|---|
| 1981 | 9.87% x 5746 | $ 567.13 |
| 1982 | 9.7% x 5746 | 557.36 |
| 1983 | 9.45% x 5746 | 543.00 |
| 1984 | 9.2% x 5746 | 528.63 |
| 1985 | 9.45% x 5746 | 543.00 |
| | Total | $2,739.12 |

**36.**

Lost Earnings on 1981 Employer's Pension Contribution

| Year | Computation of Earnings | Earnings |
|---|---|---|
| 1982 | 9.7% x 4972 | $ 482.28 |
| 1983 | 9.45% x 4972 | 469.85 |
| 1984 | 9.2% x 4972 | 457.42 |
| 1985 | 9.45% x 4972 | 469.85 |
| | Total | $1,879.40 |

**37.**

Lost Earnings on 1982 Employer's Pension Contribution

| Year | Computation of Earnings | Earnings |
|---|---|---|
| 1983 | 9.45% x 218 | $20.60 |
| 1984 | 9.2% x 218 | 20.06 |
| 1985 | 9.45% x 218 | 20.60 |
| | Total | $61.26 |

**38.** The calculations for 1982 lost earnings are based on plaintiff's retirement on January 21, 1982, the date he became 70 years old. (Plaintiff was born on January 21, 1912.) January 21, 1982, was roughly three weeks into the year or 5.76% of the total year.

**39.** Plaintiff's base salary for 1982 is computed as follows: $63,124 \times 1.06\% \times 5.76\% = \$3,854$

**40.** In 1977, R & M Kaufman continued to pay plaintiff his salary until the company became convinced that plaintiff would never return to work.

**41.** The United States argues that the damage award for economic loss must be reduced by the amount of state and federal taxes that would have been paid because 28 U.S.C. § 2674 prohibits an award of punitive damages for FTCA claims.

Under the FTCA, the law of Missouri governs damages because the swine flu vaccination was administered there. *Overton v. United States,* 619 F.2d 1299, 1305 n. 5 (8th Cir.1980). Under Missouri law, a damage award for lost income should not be reduced for taxes. *Dempsey v. Thompson,* 251 S.W.2d 42, 52 (Mo.1952).

However, the FTCA precludes an award for punitive damages regardless of state law. 28 U.S.C. § 2674. Although the Eighth Circuit has not addressed the issue, the Ninth Circuit has held that failure to deduct federal and state

or payable from Medicare Part A or Medicare Part B benefits.[42] Plaintiff responds that the damage award for medical expenses should not be reduced by the amount paid under the Medicare program because the Medicare program is a "collateral source" under Missouri law.

In *Overton v. United States*, 619 F.2d 1299 (8th Cir.1980), the United States argued that the district court erred in not deducting the amount paid by Medicare from an award of plaintiff's medical expenses. Plaintiff asserted that the Medicare program was a collateral source under Missouri law.

The Court described Missouri's collateral source rule as follows:

> The collateral source rule is an exception to the general rule that damages in tort should be compensatory only. The rule permits recovery against a wrongdoer for the full amount of damages even though the plaintiff is also compensated from a different source (such as an

insurance company) which is "wholly independent" of the wrongdoer and whose payment is therefore collateral to his. *Iseminger v. Holden*, 544 S.W.2d 550, 552 (Mo.1976).

> . . . .

> A plaintiff may invoke the collateral source rule, then, either when the payment in question came from a source wholly independent of the liable party or when the plaintiff may be said to have contracted for the prospect of a "double recovery."

*Id.* at 1306–07.

In *Overton*, the plaintiff had not paid any of the taxes that determine the level of appropriations to the Medicare Part A trust fund because she was entitled to benefits under a transitional entitlement provision for aged *uninsured* individuals who reached age 65 before Medicare was passed. *Overton*, 619 F.2d at 1305 n. 6, 1308. Therefore, because "no rationale of the collateral source rule" was implicated,

income taxes from an award for lost earnings results in punitive damages against the United States. *Hollinger v. United States*, 651 F.2d 636, 642 (9th Cir.1981). Even if the Eighth Circuit Court of Appeals would conclude that lost earnings must be reduced by projected federal and state taxes, the United States has the burden of establishing the amount of reduction for taxes. *Barnes v. United States*, 685 F.2d 66, 69 (3rd Cir.1982); *Funston v. United States*, 513 F.Supp. 1000, 1010 (M.D.Pa.1981); *accord Overton v. United States*, 619 F.2d 1299, 1309 n. 16 (8th Cir.1980) (the United States has the burden of demonstrating what proportion of plaintiff's collateral benefit is due to taxation instead of general levy because the United States obtains the benefit of the reduction and is in the best position to marshal the data).

Although some of plaintiff's tax returns were admitted into evidence, the United States did not establish how the information contained in plaintiff's prior tax returns can be used to project plaintiff's federal and state income taxes or how a reduction for federal and state taxes can be calculated. The Court is unwilling to attempt to determine plaintiff's tax reduction without the benefit of expert testimony or at least some guidance from counsel as to how the reduction should be calculated. Therefore, the United States has failed to establish the amount of reduction for federal and state income taxes.

**42.** Based on the affidavits of Leonard Nicoski, an employee of the Health Care Financing Ad-

ministration, Department of Health and Human Services (Defendant's Exhibit 415C), and Phil A. Hefner, an employee of Blue Cross Hospital Service, Inc. of Missouri (Defendant's Exhibit 415A), plaintiff has received $19,530.08 in Medicare Part A benefits.

Plaintiff's Medicare Part A Benefits

| Dates of Service | Amount Paid |
|---|---|
| 1/15/77–3/17/77 | 9,024.10 |
| 3/18/77–4/17/77 | 3,615.84 |
| 4/18/77–4/30/77 | 1,315.34 |
| 8/20/82–8/28/82 | 2,545.44 |
| 12/14/83–12/22/83 | 3,029.36 |
| Total | $19,530.08 |

Plaintiff's Medicare Part B Benefits

| Dates of Service | Amount Paid |
|---|---|
| 3/15/79–4/5/79 | $114.40 |
| 4/10/79–4/12/79 | 34.40 |
| Total | $148.80 |

The affidavit of Brenda Morrow (Defendant's Exhibit 415) suggests that a substantial additional amount of Medicare Part B benefits were paid. Defendant's Exhibit 415 consists of a number of documents including the "Medicare Standard Operating Procedure for a History Dump," a Julian Date Calendar and a computer printout purporting to show the benefits paid to plaintiff under Medicare Part B. However, Morrow's affidavit does not explain how to read the computer printout. Therefore, it is impossible to determine the actual benefits paid to plaintiff under Medicare Part B.

Medicare benefits should have been deducted from the Federal Tort Claims Act damage award. *Id.* at 1308.

■ Under the reasoning in *Overton,* a plaintiff who received Medicare Part A benefits because he contributed to the Federal Health Insurance Trust Fund by paying Social Security taxes, should receive the benefit of the collateral source rule. In *Titchnell v. United States,* 681 F.2d 165 (3rd Cir.1982); *accord Siverson v. United States,* 710 F.2d 557 (9th Cir.1983), the Court held that a plaintiff who demonstrates that he contributed to the Medicare Part A trust fund is entitled to the benefit of the collateral source rule.

In the present case, the trial court found that Mr. and Mrs. Titchnell maintained the maximum Medicare coverage and that Medicare payments were deducted from Mr. Titchnell's monthly social security check. Thus, Mr. Titchnell did contribute directly to the Medicare Part B trust fund. Moreover, there is evidence from which we can infer that Mr. Titchnell contributed indirectly to the Medicare Part A trust fund. Presumedly, Mr. Titchnell paid social security taxes during the time he was self-employed. It is these revenues which determine the level of appropriations from the treasury to the trust fund for Medicare Part A. Therefore, since the plaintiffs have shown that they have contributed to the funds which they claim to be collateral, the trial court properly refused to reduce the damage award to the extent that these medical expenses were reimbursed by Medicare.

*Titchnell,* 681 F.2d at 176.

■ Here, plaintiff made contributions to the Health Insurance Trust Fund that funds Medicare Part A. In addition, Medicare Part B benefits are paid only to those who enroll and pay regular premiums. Medicare premiums have been withheld from plaintiff's Social Security retirement benefits since he began receiving benefits in early 1977. Therefore, the award of special damages to cover plaintiff's medical expenses should not be reduced by the amount of Medicare Part A or Part B benefits.

The United States next argues that failure to deduct the amount of plaintiff's Medicare benefits results in a punitive damage award prohibited by the Federal Tort Claims Act.[43] Defendant cites no cases supporting this proposition.

■ Punitive damages cannot be awarded under the Federal Tort Claims Act. 28 U.S.C. § 2674. However, application of the collateral source rule is consistent with the prohibition against awarding punitive damages because the collateral source rule merely prevents defendant from receiving a windfall by paying less than plaintiff's actual compensatory damages. *Smith v. United States,* 587 F.2d 1016–17 (3rd Cir.1978); *accord, Siverson,* 710 F.2d at 560.

■ Finally, the United States argues that an award of damages for loss of earnings should be offset or reduced by the amount of Social Security retirement benefits received by plaintiff.[44] Plaintiff received Social Security retirement benefits because he had paid the required amount of Social Security taxes over a lengthy period of time. *See* Defendant's Exhibit 416. Therefore, applying the *Overton* analysis, the Social Security retirement benefits received by plaintiff should not be deducted under Missouri's collateral source rule.

### ORDER

For all the reasons stated, it is hereby ORDERED that judgment is entered against defendant the United States and in

---

**43.** This argument was raised by the United States in *Overton,* 619 F.2d at 1309, but was not addressed by the Court.

**44.** According to the affidavit of Thomas P. Dermyer, Program Specialist with the Social Security Administration, Department of Health and Human Services, plaintiff received $40,488.80 in Social Security retirement benefits for the period January, 1977, to December, 1982 (Defendant's Exhibit 416).

favor of plaintiff Louis Manko in the amount of $1,171,442.01.[45]

## APPENDIX 1

ORDER GRANTING DEFENDANT'S RE-QUEST TO IMPOSE SANCTIONS IN LIEU OF ORDERING DEFENDANT TO PRODUCE ADDITIONAL EPIDE-MIOLOGICAL DOCUMENTATION TO PLAINTIFF

Nov. 29, 1983

On November 15, 1983, during two telephone conferences with counsel, the Court orally granted plaintiff's motion for a limited follow-up investigation into certain administrative claim forms which defendant had not produced in accordance with a previous order. On November 18, 1983, the oral order of November 15, 1983, was confirmed by an Order entitled "Order Denying Motion for Sanctions and Requiring Defendant to Comply Forthwith with the July 8, 1983, Order."

On November 17, 1983, defendant moved for an order imposing sanctions on defendant rather than requiring further production of the administrative claim forms. Defendant proposed several possible sanctions:

> One sanction suggested by defendant in this situation is that the Court find that defendant is not entitled to rely on any administrative claims, except for the claim of Louis H. Manko, for any purpose in this case. An alternative sanction suggested by defendant is that the Court find that a document would support the conclusion of Dr. Goldfield. The Court could make a finding that the selected medical records submitted by claimants with administrative claims would be used by a non-expert to determine whether or not the claimant suffered from the Guillain Barre Syndrome.

Plaintiff opposed defendant's request on November 21, 1983, stating that the proposed sanctions were "an inadequate substitute for the discovery that had been ordered." Plaintiff's Suggestions filed November 21, 1983, p. 1. Plaintiff opposed any sanction limited only to assuming the inadequately produced claim forms reflected that the claimants had GBS because:

> Dr. Goldfield's analysis requires more information than whether or not a claim represented a GBS case. The study also requires information on whether the claimant was vaccinated with the swine flu vaccine, the date of the vaccination, and the date of onset of disease symptoms.

During a telephone conference on November 23, 1983, defendant proposed the imposition of additional sanctions in the form of additional assumptions about what the inadequately produced claim forms would show if they had been produced and examined by plaintiff's expert. Plaintiff requested an opportunity to consider defendant's new proposal.

On November 25, 1983, during another telephone conference, plaintiff proposed alternative wording for the proposed sanctions. Plaintiff was concerned about whether any sanctions imposed would establish facts for this case or whether the sanctions were merely a substitute for discovery.

After a lengthy discussion with counsel, the Court became convinced that the imposition of sanctions as a substitute for discovery was a sensible and efficient solution to this discovery dispute. Defendant resists producing the administrative claim forms as filed by the claimants. Plaintiff insists that he must have access to the administrative claim forms as they were filed which would include all attachments.

Although this case has been pending for four years, this dispute comes to a head less than two months before the trial date. By imposing the following sanctions, not only will a long and expensive production process be avoided, but the January 9, 1984, trial setting can be preserved.

Therefore, at defendant's request and for the reasons previously stated in orders and

| 45. | Total Damages | | Total Damages |
|---|---|---|---|
| Pain and Suffering | $250,000.00 | Medical Expenses | $ 69,778.01 |
| Permanent Disability | 275,000.00 | Lost Earnings | 576,664.00 |
| | | Total | $1,171,442.01 |

telephone conferences concerning the discovery problems resulting from the July 8, 1983, Order, the defendant is precluded from contesting that if the administrative claim forms designated by plaintiff had been produced as ordered on July 8, 1983, and November 18, 1983, the following information would have been reflected therein:

1) Any claimant who alleged that he or she developed GBS peripheral neuropathy, polyneuropathy, polyneuritis, Landry Strohl Guilliam Barre Syndrome, polyradiculoneuropathy, paralysis of more than one limb, weakness of more than one limb, and any claimant whose injury is not indicated on the administrative claim form, in fact, had GBS.

2) A claimant's statement on the administrative claim form produced for plaintiff that he or she was immunized with the Swine Flu vaccine will be presumed correct.

3) Any claimant who denies having been immunized on the claim form produced for plaintiff's inspection or who states facts on the claim form produced indicating that the claimant was not immunized, in fact, was not immunized. However, if the information on the claim form produced for plaintiff is unclear or nonexistent, such a claimant will be assumed to have stated that he or she was immunized.

4) A claimant's statement that he or she was immunized on a certain date will be presumed correct. If no date is set forth then defendant agrees not to contest a date of immunization which is consistent with other relevant factual information stated on the copy of the claim furnished to plaintiff. If no information is furnished on the claim form from which to make a reasonable inference of the immunization date, then defendant is precluded from contesting the immunization date assigned by plaintiff.

5) A claimant's statement on the administrative claim form produced for plaintiff's inspection that his or her GBS had its onset on a certain date will be presumed correct. If no onset date is indicated on a claim form then defendant will not contest a date of onset which is consistent with any other relevant factual information stated on the copy of the claim furnished to plaintiff. If no information is furnished on the claim form from which to make a reasonable inference about the onset date, then defendant is precluded from contesting the onset date assigned by plaintiff.

IT IS SO ORDERED.